**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRUSTX DIGITAL ADVERTISING SERVICES, INC., P.B.C., | |
| Plaintiff, | Civil Action No. 1:26-cv-3135 |
| v. | **JURY TRIAL DEMANDED** |
| GOOGLE LLC AND ALPHABET INC., | |
| Defendants. | |

## COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PARTIES ............................................................................................................................. 4

JURISDICTION AND VENUE ........................................................................................... 5

FACTUAL ALLEGATIONS ............................................................................................... 6

I.      In 25 Years, Open-Web Advertising Has Grown to Become a $100 Billion Business...... 6

        A.      Technological Innovation Provides Increased Control and Flexibility for Both
                Advertisers and Publishers............................................................................... 6

        B.      Anatomy of the Ad Tech Stack......................................................................... 7

II.     Google Obtains Monopoly Power in the Markets for Open-Web Display Ad Exchanges
        and for Publisher Ad Servers. ................................................................................... 11

        A.      Google Leveraged its Early Monopoly in the Market for General Internet Search
                to Establish Control Over a Crucial Pool of Advertisers. ................................ 11

        B.      Google Used Acquisitions and Investments to Gain Scale on the Sell-Side of the
                Market and to Neutralize Competitive Threats................................................. 14

        C.      Google Implemented Project Bernanke to Maintain Its Monopoly Power and
                Ensure AdX Won Impressions Over Competitor Exchanges. ........................... 27

III.    TRUSTX, Backed by Prominent Publishers, is a Premium Marketplace Designed to
        Restore Trust and Transparency in Programmatic Advertising...................................... 31

IV.     TRUSTX Responds to Google's Exploitation of its Market Power by Competing through
        the Innovation of "Header Bidding." ......................................................................... 34

V.      Google Exploits Its Market Power to Crush Competition from Header Bidding.............. 38

        A.      Last Look and SSDRS .................................................................................... 38

        B.      Project Poirot ................................................................................................. 43

        C.      Open Bidding .................................................................................................. 46

        D.      Unified Pricing Rules...................................................................................... 49

VI.     Google Exercises Monopoly Power in the Global Open-Web Display Ad Markets for
        Both Ad Exchanges and Publisher Ad Servers.............................................................. 51

A.      Both the Publisher Ad Server and Ad Exchange Markets are Worldwide. .......... 51

B.      Publisher Ad Servers Are a Distinct Product Market. ......................................... 52

C.      Google Possesses Monopoly Power in the Worldwide Market for Publisher Ad Servers ................................................................................................................ 54

D.      Ad Exchanges for Open-Web Display Ads Are a Distinct Product Market. ........ 54

E.      Google Possesses Monopoly Power in the Worldwide Market for Open-Web Display Ad Exchanges. ........................................................................................ 56

VII.    Google Has Market Power in the Worldwide Markets for Buy-Side Tools for Display Advertising ................................................................................................................ 57

A.      Buy-Side Tools for Small Advertisers Are a Distinct Product Market. ............... 59

B.      Buy-Side Tools for Large Advertisers Are a Distinct Product Market. ............... 60

C.      Google Has Sufficient Power in the Markets for Buy-Side Tools for Display Advertising to Constrain Competition in the Ad Exchange Market. .................... 61

VIII.   Google Abused Its Monopoly Power Through the Implementation of Anticompetitive Policies ............................................................................................................... 64

IX.    TRUSTX's Claim Is Not Barred by the Statute of Limitations. ....................................... 67

CLAIM ......................................................................................................................... 73

REQUEST FOR RELIEF ............................................................................................. 76

REQUEST FOR A JURY TRIAL ................................................................................ 76

iii

## INTRODUCTION

1.      As set forth in multiple complaints and incorporated below, Google is an abusive monopolist.[1] Federal courts have already made this finding. What began in 1998 as an epitome of American entrepreneurship—a Silicon Valley start-up providing the means to navigate the astonishing new world of online information—became a behemoth, crushing innovative competitors and extracting monopoly profits from its control over essential components of the internet economy.

2.      The pattern is unmistakable. Beginning with its unlawfully maintained monopoly over internet search, Google routinely exploited its market power in one sector to establish entrenched dominance in another. Google did this in myriad ways, from coercive tying arrangements, to prohibitions on steering customers to lower-cost rivals, to technological "solutions" that favored Google's own products in adjacent markets, to gleaning critical data about markets it controls while refusing to provide access to competitors on an equal footing. With these actions, Google illegally dominated a market that is both enormous and often invisible to the average internet user.

3.      In its landmark digital advertising antitrust case against Google, the U.S. Department of Justice emphasized the scale of the market in question, noting that "[w]ebsite publishers in the United States sell more than 5 trillion digital display advertisements on the open web each year—or more than 13 billion advertisements *every day*."[2] For context, the number of daily transactions for open-web display advertising units outstrips the 650 million daily transactions processed by VISA and 51 million daily trades on the New York Stock Exchange by

---

[1] *See, e.g.*, First Amend. Consolidated Compl., No. 1:21-md-03010-PKC (S.D.N.Y. Mar. 11, 2026), ECF 1543; Consolidated Amend. Compl., 1:21-md-03010-PKC (S.D.N.Y. Mar. 6, 2026), ECF 1511.

[2] Compl. at 5, *United States et al. v. Google LLC*, No. 1:23-cv-00108 (E.D. Va.), ECF 1.

several multiples.

4.      Many website users are unaware of the sophisticated advertising infrastructure that operates behind the scenes of each visit to help publishers monetize their digital content. Most advertisements appearing on webpages today result from "programmatic sales," meaning transactions that are negotiated and finalized electronically, often through real-time bidding rather than through direct sales. The technology that enables these programmatic sales, known as the "ad tech stack," executes hundreds of billions of individual ad sales every day, engaging with advertisers, website publishers, and users around the world.

5.      The ad tech stack connects advertisers seeking to sell products and services to individual website users who may be interested in those products. Advertisers engage with demand-side platforms (DSPs), which connect to supply-side platforms (SSPs), also called ad exchanges, like TRUSTX. In turn, ad exchanges connect to publishers through their publisher ad servers (technology that helps publishers manage their digital ad inventory). At each phase, intricate technology capable of processing millions of transaction requests per second communicates in near real-time to deliver meaningful ads to interested users. Ad revenue from these transactions helps keep the open web free because publishers do not need to charge subscription fees to users who access ad-supported content.

6.      Google maintains a dominant position in every part of the ad tech stack and entrenched its power through anticompetitive conduct rather than fair competition. It has monopoly power in both the publisher ad server market and in the ad exchange market. Google was not the first entrant in either of these markets and did not achieve its market position by developing innovative products. Instead, Google purchased substantial market share by acquiring the leading platform used by publishers to sell ad space (DoubleClick), then leveraged its power

2

in search—and thus its control over an essential pool of advertisers purchasing search-related ads—to force even more publishers to adopt the platform. Google's efforts have been an unmitigated success. Ultimately, 90% or more of internet publishers adopted Google's publisher ad server. With its power in the publisher ad server market entrenched, Google then used that power to favor its ad exchange, AdX, and quickly established monopoly power in that market as well.

7. Controlling the publisher ad server gave Google influence over the crucial final step in the sale of an ad—the publisher's decision to choose one advertiser's offer over another. Google repeatedly abused its dominant position by manipulating the sale logic within its publisher ad server to favor offers originating from Google's ad exchange. This behavior impeded competing exchanges' ability to secure sales. Google's anticompetitive measures prohibited publishers from steering advertisers to lower-cost platforms and forced rival ad exchanges to engage in expensive and inefficient efforts to develop work-arounds that would have been unnecessary in a fair market, and then to do yet more work convincing publishers and other market players to adopt their solutions. None of this succeeded in threatening Google's dominance or establishing a truly competitive market.

8. TRUSTX is a longstanding and successful competitor in the ad exchange market, but its success has been greatly curtailed by Google's anticompetitive acts.

9. Founded in 2016 by 30 prominent members of Digital Content Next—including Dotdash Meredith, Disney, Fox News, NBCUniversal, and Paramount—TRUSTX is a public benefit corporation operating a marketplace uniquely committed to ethical programmatic advertising. As further described below (Section III), TRUSTX's cutting-edge infrastructure integrates privacy protection with a direct-to-publisher model to deliver a transparent supply chain

3

that is 100% human and viewable.  The premium private marketplace has been free of made-for-advertising content from its first day of business.  Publishers on the TRUSTX platform include the world's most respected lifestyle, sports, entertainment, technology, and news brands, enabling TRUSTX to offer programmatic advertising at scale through a more direct buyer-to-seller connection.

10.    Despite offering unique and desirable features and making substantial investments in those features to deliver real and recognized value to its publisher members, TRUSTX could not compete on a level playing field with Google because of Google's self-serving, built-in advantages and other associated anticompetitive conduct. Google's exploitation of its monopoly over publisher ad servers to favor its own ad exchange and punish rivals materially harmed TRUSTX. For years, Google intentionally concealed its conduct, making it impossible for rivals to counteract these anticompetitive behaviors. Hidden behind layers of complex technical design, opaque policies, restricted data access, and rigged auction mechanics, Google wove its abusive practices deeply within the fabric of its systems. The harm was real, but the mechanisms were obscured; it was only after years of investigation, expert scrutiny, and compelled discovery that an understanding of these practices emerged. Google's anticompetitive restraints limited TRUSTX's success in the market for ad exchanges to a level that is far below what it would have achieved in a genuinely competitive environment.

11.    To remedy these wrongs, TRUSTX brings this suit.

### PARTIES

12.    Plaintiff TRUSTX Digital Advertising Services, Inc., P.B.C., is a New York public benefit corporation (B-Corp) with its corporate headquarters and principal place of business in New York, New York.

13.    Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google has offices in New York and other cities throughout the United States and around the world. Google LLC is the primary operating subsidiary owned by the publicly traded holding company Alphabet Inc., which is incorporated in Delaware. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California. Alphabet Inc. is a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California. Alphabet was created as a holding company for Google LLC in late 2015. Since December 2019, Alphabet Inc. and Google LLC have had the same Chief Executive Officer. Alphabet Inc. controls Google LLC's day-to-day operations. Virtually all of Alphabet Inc.'s revenue comes from Google LLC. As a result of Alphabet Inc.'s operational control, Google LLC is Alphabet Inc.'s alter ego. For purposes of claims asserted by TRUSTX, "Google" should be understood to include both Google and Alphabet.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the federal antitrust claims asserted in this case pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

15.    This Court has personal jurisdiction over Google because it conducts extensive business in interstate commerce, including in this District, and it offers and sells products and services related to the claims at issue in this case, including advertising technology, to customers in this District.

16.    Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. § 1391 because Google transacts business in this District, including business related to the advertising technology at issue in this litigation.

5

**FACTUAL ALLEGATIONS**

**I.      In 25 Years, Open-Web Advertising Has Grown to Become a \$100 Billion Business.**

**A. Technological Innovation Provides Increased Control and Flexibility for Both Advertisers and Publishers.**

17.      Display ads are "online ads that engage users with text or image-based marketing content, link to the advertiser's webpage, and often appear in rectangular spaces on publishers' websites." *United States v. Google LLC ("Ad Tech Liability Op.")*, 778 F. Supp. 3d 797, 821 (E.D. Va. 2025). Viewers see display ads when they visit webpages from a browser on a computer or mobile device. *Id.* Open-web display ads are ads that "run on websites that use third-party ad tech infrastructure to match advertisers' ads to publishers' inventory." *Id.* Recent estimates indicate that nearly 60% of users' time online is spent on the open web. Advertising sales on the open web accounted for an estimated \$104 billion in 2024 alone.

18.      Digital infrastructure developed and implemented over the past 25 years enabled this economy. The data-processing power of this infrastructure creates several advantages for internet advertising compared to traditional print and broadcast media. An internet advertiser can more precisely target its audience using data on specific demographics, behaviors, interests, and locations; for example, an advertiser may favor users whose recent web browsing history suggests potential interest in its product.

19.      An internet advertiser can also tailor its advertising strategy—for instance, capping expenses by limiting the number of actual views of a given internet page, *i.e.*, the number of "impressions," that will include the ad. These capabilities also create opportunities for smaller advertisers to purchase a carefully selected or narrowly targeted series of impressions, keeping their expenses down while maximizing the potential impact of their advertising investments. Perhaps most importantly, publishers can monetize remnant digital ad inventory that does not sell

6

through traditional direct sales models.

20.     Open-web display advertising appeared shortly after the world wide web was first introduced in 1993. Initially, buyers purchased ads through direct sales, when an advertiser (or its agency) would contract directly with a website publisher to have its advertisements displayed alongside the publisher's content. By the late 1990s, intermediaries known as "ad networks" developed to facilitate larger and more widely disbursed advertising purchases. Generally, ad networks negotiated with a set of publishers to acquire a large volume of advertising space, then bundled impressions from various publications and sold them, with a mark-up, to advertisers.

21.     By the early 2000s, the process became more thoroughly automated, laying the groundwork for modern programmatic ad sales. Software tools developed to support automated management of an enormous volume of individual advertising transactions on an impression-by-impression basis. Eventually, these tools evolved into what is known as the "ad tech stack," a collection of software products that effectively negotiate for the sale of billions of impressions daily following pricing and placement guidelines established by publishers, advertisers, and other market participants.

### B.     Anatomy of the Ad Tech Stack.

22.     Programmatic advertising bifurcates into two sides commonly referred to as the 'buy-side' (advertisers seeking to purchase display ad space) and the 'sell-side' (publishers seeking to sell space for display ads on their webpages). Each side relies on software that supports its ability to engage with the programmatic market where millions of ad sales are transacted every minute.

23.     The term "**ad tech stack**" refers to these programmatic advertising tools that intermediate the transaction between advertisers and publishers, *i.e.*, the process of serving advertisements on websites and apps. Each function in the ad tech stack is performed by different

7

software. While the components of the ad tech stack must interact and share common parameters, each operates separately and is understood by industry participants to be a distinct product.

Different components of the ad tech stack include:

### *Buy-Side Technology*

**Advertiser ad servers:** stores files for various advertisements and tracks the performance of different ads served in different publications, including information about whether the user clicked through on the ad to visit the advertiser's website, whether a purchase was made, and similar data.

**Demand-Side Platforms (DSPs):** manages advertisers' interactions with publishers by evaluating the desirability of an available impression and generating bids within parameters established by the advertiser to fulfill the goals of the relevant campaign. Each DSP works with many advertisers so that it has many sources of potential demand for every impression made available to the DSP.

### *Sell-Side Technology*

**Ad exchanges** (also known as Supply-Side Platforms or SSPs): receives information about available impressions from publishers, conducts individual auctions among selected DSPs to identify a winning bid for each impression, and then communicates the winning bid to the relevant publisher's ad server along with the corresponding ad.

**Publisher ad servers:** responsible for making decisions about what ads to show on a website (*i.e.*, filling the ad slots on a website) by managing a publisher's available ad space, including describing the size and placement of an ad opportunity, identifying and communicating with the ad exchanges or other sources from which the publisher wants to obtain bids, setting minimum (floor) pricing, and, when there are multiple potential purchasers of a particular impression, determining which of them will win the transaction and therefore which ad will be served.

24.    The relationship between these different components is illustrated below:



25.    These technological components of the ad tech stack support programmatic ad sales at an almost unimaginable scale. An individual ad sale occurs each time a user anywhere in the world opens a webpage from a publisher who sells ad space using at least a subset of the tools in the ad tech stack. Within the fraction of a second it takes for the webpage to load in the user's browser:

(i)    the publisher ad server assembles information about the impression, including the context and characteristics of the ad space and, in many cases, information about the user who is accessing the page;

(ii)   the publisher ad server transmits this information to one or more ad exchanges, either sequentially or simultaneously;

(iii)  the ad exchanges receive data on the impression and seek bids from multiple DSPs, each of which represents many advertisers;

(iv)   each DSP determines which of its demand sources has the highest bid (or should be selected as the winning bid on some other basis) and transmits that information to the

9

ad exchange;

(v)    the ad exchange evaluates bids received from different DSPs to determine whether one or more of the bids meets the requirements of the publisher, including meeting or surpassing the floor price for the bid, then selects one such bid as the winner of the ad exchange auction and submits that bid to the publisher ad server;

(vi)   if the publisher ad server sought and obtained bids from multiple exchanges simultaneously, it determines which bid submitted from which ad exchange will win the transaction;

(vii)  the publisher ad server delivers the advertising copy and other media for the winning advertisement to the publisher so that it can be loaded on the webpage displayed to the user along with the publisher's content.

26.    While direct sales and ad networks continue to play a role in the sale of open-web display advertising, over the last 20 years an increasing number of sales have been executed programmatically using the ad tech stack. Thus, the technology that makes up the ad tech stack is responsible for operating an almost entirely automated market involving tens of billions of transactions every day.

27.    This lawsuit arises from Google's use of anticompetitive means to establish, maintain, and exploit market power over multiple components of the ad tech stack. Ultimately, this monopoly over crucial technology has allowed Google to dominate programmatic ad sales, using its market power to punish innovative competitors, such as TRUSTX, while extracting enormous profits for itself.

**II.    Google Obtains Monopoly Power in the Markets for Open-Web Display Ad Exchanges and for Publisher Ad Servers.**

**A.    Google Leveraged its Early Monopoly in the Market for General Internet Search to Establish Control Over a Crucial Pool of Advertisers.**

28.    Google's founding in 1998 began with the launch of its general search engine product featuring its PageRank algorithm. Like other search engines at the time, Google's search engine product comprised software that produced links to websites and other relevant information in response to a user query. *United States v. Google LLC*, 747 F. Supp. 3d 1, 35 (D.D.C. 2024). In the early days, Google users were conducting millions of searches per day. Now, that daily search number is estimated to be in the billions. Google's search product has become the most widely used search engine in the United States, receiving nine times more queries per day than all of its rivals combined across all devices.

29.    Google's dominant market share in search—combined with its anticompetitive and exclusionary conduct—led the U.S. District Court for the District of Columbia to conclude that Google was a monopolist in both the general search services and general text advertising markets, and that it maintained those monopolies through anticompetitive conduct, thereby violating Section 2 of the Sherman Act. *Id*. at 187.

30.    From the beginning, Google knew that its search product *could* serve as a boon for advertising revenues, given that search offered companies seeking to market their goods and services a "unique opportunity . . . to place digital ads that matched precisely what an Internet user was looking for at that moment." *Ad Tech Liability Op.* at 823. But in those early days, Google had no plan to make money outside of licensing its search and indexing technology to other companies. Founders Larry Page and Sergey Brin reportedly expressed discomfort with business arrangements that called for the mixing of search and advertisement.

11

31.     That changed in 2000, when Google introduced "paid search" with its AdWords product. AdWords began as a self-serve advertising platform that allowed companies of all stripes—including small brick-and-mortar businesses like restaurants and retail shops—to buy ads within Google's search platform. Among other things, AdWords allowed its customer-advertisers to bid on search keywords to display text ads alongside search results shown to users.

32.     AdWords grew rapidly. According to Google, AdWords' beta version had around 350 customers in the fall of 2000. By 2003, AdWords counted over 100,000 customers and 95% of its nearly one billion dollars in sales came from search-related advertisements. By 2007, AdWords had over one million customers and, together with AdSense, it made up the largest digital advertising network in the world.

33.     During this period, other software companies were developing the technology for automated ad placement and sales that ultimately led to the ad tech stack. Observing this trend, Google realized that AdWords could be used not only to sell advertising space on its own search results pages, but also to target advertisements for any other webpage that was seeking to generate revenue. Google thus expanded the AdWords product offerings by allowing advertisers to buy ads across third-party websites, and by growing the number of publishers with which its advertisers could place ads by forming partnerships with popular non-Google content sources.

34.     A few years after launching AdWords in 2000, Google launched its AdSense product, which gave website publishers the ability to sell space for ads targeting the website's visitors or audience. Unlike search advertising, where advertisements were tied to a search-user's query, AdSense provided what Google called "contextual advertising"—that is, the particular ad to be served could be selected to match the "context" of the content against which it is displayed. Contextual tools like AdSense scan the publisher's webpage for keywords that identify its content

(*e.g.*, a blog about college football will feature sports-related keywords) and then match ads to those keywords (*e.g.*, an advertisement for running shoes or cable sports packages.)

35.     Through the success of AdWords, Google developed relationships with a large pool of advertisers. Indeed, AdWords quickly became one of the world's largest and most concentrated pools of advertiser demand, capturing a wide range of advertisers that almost exclusively used Google's technology to buy ads online. Because AdWords was primarily intended for and used by small and relatively unsophisticated advertisers, such advertisers typically could not, or did not want to, split their advertising campaigns among multiple ad buying tools, opting instead to exclusively use AdWords as a one-stop-shop for their online advertising needs. By 2022, four million advertisers were using AdWords exclusively, and AdWords purchased over 45% of worldwide open-web display impressions that were not transacted through direct deals. "**AdWords Demand**" refers to the large pool of Google-controlled advertisers that bid exclusively through AdWords. What Google needed was the means to connect these advertisers to third-party publishers that could sell advertising space.

36.     Google's unique position atop the majority of the world's search queries and subsequent user browsing activity gave it unparalleled access to information crucial to advertisers and publishers. With AdSense and AdWords, Google was able to leverage its dominant market position in the search market to gain an advantage in both the buy- and sell-sides of the open-web display ads market. But AdSense still left a hole in Google's market position. Although AdSense proved useful for selling "remnant" or "long-tail" publisher inventory—leftover ad space that doesn't sell by way of more valuable "direct sold" deals between advertisers and publishers—AdSense had not managed to captivate a stable of premium publishers.

13

**B.    Google Used Acquisitions and Investments to Gain Scale on the Sell-Side of the Market and to Neutralize Competitive Threats.**

**1.    Google Overpaid for DoubleClick for Publishers (DFP), and its Nascent Accompanying Exchange (AdX) Specifically to Thwart Competition.**

37.    Google did not innovate to earn power in the sell-side of the market. Instead, Google acquired the market-leading technology, and then leveraged its massive AdWords advertiser base to lock in relationships with publishers, ultimately increasing its market share to over 90%. That dominance allowed Google to gain control over how, when, and to whom ad impressions are sold on the open web.

38.    In 2008, Google acquired DoubleClick for $3.1 billion—a price that exceeded Google's own internal valuations of DoubleClick by about a billion dollars, as Google internally valued DoubleClick's business at between $1.8 billion and $2.2 billion. This strategic acquisition provided Google with two crucial assets.

39.    The first was DoubleClick's ad server product, called **"DoubleClick for Publishers" or DFP**. At the time of its acquisition, DFP was already the dominant publisher ad server in the marketplace with 60% of the publisher ad server market and 9 of the top 10 U.S. websites as its customers. *Ad Tech Liability Op.* at 825. By acquiring DFP, Google acquired direct relationships with the largest sources of premium digital ad inventory—something that Google's AdSense lacked.

40.    Google was able to abandon its internal efforts to develop competing technology, while keeping the sell-side control that DFP offered out of the hands of other digital advertising rivals like Microsoft, Yahoo, and AOL/Time Warner. Google's choice was clear; it purchased control over the market for this essential component of the ad tech stack by acquiring pre-existing, rival technology, rather than by competing through innovation.

14

41.    Perhaps most importantly, Google understood that the publisher ad server played a crucial role for programmatic ad sales because it contained the logic for making the final decision about which advertisement from any group of competing offers would be selected. By acquiring the platform that already had a dominant position in that market, Google began to wield extraordinary power over advertising sales. In the years following the acquisition, Google repeatedly exploited this power to favor its own products over those of competitors and to increase, and then entrench, its own products' market share.

42.    A key second part of the DoubleClick deal was **AdX**, a "nascent ad exchange . . . that connected the two sides of the ad tech stack by matching advertiser bids with publisher inventory." *Ad Tech Liability Op.* at 825. Although the acquisition instantly made Google the leader in publisher ad servers because of DFP's large market share, the ad exchange component of the acquisition had no such dominance.

43.    At the time of DoubleClick's acquisition by Google, its AdX platform was small, with DFP projecting that AdX would generate only $800,000 in total revenue in 2007. But given Google's established dominance in advertising demand (AdWords) and its newly acquired dominance in publisher inventory via the publisher ad server market (DFP), Google had all the tools to not only make AdX the dominant platform in the advertising exchange market, but to stifle competition in markets for other components of the ad tech stack as well. Following the success of its DoubleClick acquisition, Google extended and protected its domination of the ad tech stack by acquiring other innovative competitors such as AdMeld and Invite Media, incorporating their technology into Google's products and stifling any threat they posed to Google's market position.

### 2.    Google Forced Publishers to Adopt DFP to Access AdWords Demand.

44.    Even though at the time of the acquisition, DoubleClick for Publishers had a

dominant 60% market share, Google still faced competition in the publisher ad server market from large rivals like aQuantive, ValueClick, and 24/7 Real Media. It pursued a strategy to crush this competition and fully monopolize the market for publisher ad servers by leveraging its control over the buy-side of the market—in particular the massive pool of small to medium sized advertisers that is essential to many publishers—to coerce even more publishers into using DFP and forcing adoption of Google's newly acquired ad exchange, AdX.

45.     When Google re-launched DoubleClick Ad Exchange as Google Ad Exchange in 2009 (still "AdX" or "AdX 2.0" for short), Google marketed its AdX platform as a tool for integration: AdX would integrate Google's sell-side platform for publishers (AdSense) with Google's buy-side platform for advertisers (AdWords), while also promoting new capabilities AdX had not previously offered: real-time bidding for bids originating within the AdX platform.

46.     The advent of real-time bidding was among the crucial developments that allowed the modern economy of programmatic web advertising to flourish. For a **real-time bid ("RTB")**, advertisers receive information about a specific opportunity on a webpage as the page renders for the user. In milliseconds, the technology allows advertisers to bid for the opportunity to present an ad based on specific details about that impression, frequently including data about the user accessing the page.

47.     With such information, advertisers can gauge how desirable a specific impression would be for the products or services they are trying to sell and adjust their bids accordingly. In response, publishers received an instantaneous price signal from an advertiser tailored to each individual ad space and user, as opposed to simply learning whether a given demand source had met its price floor through a binary "yes"/"no" response. RTB therefore allowed the publishers to consider the price of the winning bid for a specific ad space and compare it in real time against

16

other demand sources, such as direct deals, *before* deciding which source would fill the ad space. As discussed below, Google did not adopt true RTB that pitted all demand sources, including rival exchanges, against each other; Google's AdX/DFP ecosystem continued to restrict publishers to obtaining bids from only one exchange at a time (*see below* Section II.B.3.b.)

48.    In addition, Google restricted RTBs from the essential AdWords Demand source, encompassing millions of small to medium sized advertisers, to the AdX exchange. Because AdWords Demand and RTB were so valuable to publishers, these restrictions served as a powerful component of Google's monopolization strategy.

49.    When Google launched AdX, Google did not merely "integrate" its buy-side and sell-side platforms—it bound them together via a tie-in. As the U.S. District Court for the Eastern District of Virginia previously found:

> After acquiring DoubleClick, Google implemented two policies that incentivized both advertisers and publishers to use AdX. First, with limited exceptions, Google made AdX the only ad exchange into which AdWords advertising demand was permitted to bid. Second, Google required publishers to use DFP as their ad server if they wanted to access real-time bids from AdX.
>
> Through these two policies, AdX became the "glue that seal[ed] DFP" inventory to AdWords demand.

*Ad Tech Liability Op.* at 825-26 (internal citations omitted).

50.    Functionally, publishers *could* sell their inventory using a non-Google ad server and non-Google exchanges. Realistically, this choice was no choice at all because, as Google knew and intended, DFP was the only publisher ad server that could grant publishers access to RTB from AdX and, in turn, to AdWords (now called Google Ads) demand.

17



51.    Furthermore, because managing, customizing, and programming an ad server is a time-intensive and labor-intensive process, a publisher's selection of an ad server is sticky. The costs and investment of time and money to switch are high. The U.S. District Court for the Eastern District of Virginia noted that, in the words of a former Google and DoubleClick executive, switching publisher ad servers "[t]akes an act of God to do" and is a "nightmare" because "[n]othing has such high switching costs." *Ad Tech Liability Op.* at 851.

52.    Very few, if any, publishers use more than a single ad server to manage their ad inventory, meaning the decision to use DFP locked publishers in for the long haul. Google's efforts to force publishers to adopt DFP worked—the platform's 60% market share in 2008 grew to 90% or more world-wide by the late 2010s.

53.    Over time, Google reinforced the coercive pressure of its tie, closing off loopholes. For example, some publishers had contracts with Google that allowed them to access AdX demand without using DFP. In early 2018, Google began renegotiating publisher contracts to eliminate the few remaining AdX-only contracts in existence, requiring publishers to sign a combined contract that included both the DFP ad server and the AdX exchange. In an internal email Google's Managing Director for Publisher Platforms Strategy explained that Google contractually "jamm[ed] DFP and AdX together to ensure that we take the best of both worlds."

18

54.     In addition to forcing publishers to use DFP, Google's restriction of AdWords Demand to AdX severely hampered the development of competing exchanges. A large pool of advertisers willing to purchase web display ads is the source of the "liquidity" essential to the success of any exchange. Because Google dominated and controlled the largest source of liquidity, any competing exchange faced enormous challenges in scaling sufficiently to become a credible market participant regardless of how innovative their technology or how competitive their pricing. Huge numbers of small- to medium-sized advertisers that might provide the necessary liquidity were reliant on Google's AdWords platform, and Google refused to channel any meaningful portion of AdWords Demand to any exchange other than its own AdX.

### 3.     Google Exploited DFP's Control Over Publisher's Ad Purchasing Decisions to Favor AdX.

55.     Once Google made DFP the required ad server platform for publishers, Google set about further stifling competition in the ad exchange market by giving its own exchange, AdX, a baked-in advantage within DFP over competing exchanges.

#### a.     DFP's Black Box.

56.     Google laid the foundation for its anticompetitive campaign against rival ad exchanges by limiting publishers' ability to determine which bid from which exchange would win the sale. After Google assumed control over DFP, the logic for choosing a winner between competing offers became a black box: while Google decided to announce certain principles that the system apparently followed, many crucial details (several of which explicitly favored AdX, as discussed below) remained unclear. The DFP black box not only impacted publishers, who were frequently unable to adjust the system to accommodate their preferences for certain advertisers or exchanges, but also harmed non-Google exchanges because they lacked information necessary to source advertisers' bids in ways that would maximize chances of winning desired impressions and

hence improve the overall efficiency of the market.

57.    The DFP black box forced rival ad exchanges to undertake significant, and expensive, data analysis efforts in attempts to determine the logic that DFP used to choose between competing bids.  TRUSTX invested substantial resources in data analysis and bid optimization to try to figure out why it struggled to grow.

**b.    DFP's Waterfall Protects Incumbents and Creates the Opportunity for Google to Manipulate Outcomes.**

58.    When Google acquired DoubleClick, DFP used a process known as the "waterfall" to determine which exchange would generate the winning bid for a particular impression. In the waterfall, DFP would call a pre-determined sequence of ad exchanges seeking a successful bid. If an exchange could not generate a bid from one of its advertisers that met the publisher's floor price and other conditions, then DFP would turn to the next exchange in the sequence and attempt to secure the sale there. As soon as an exchange produced a satisfactory bid, DFP would stop cascading down the waterfall and initiate the process for completing the sale and serving the winning ad to the user.

59.    In the early days of programmatic ad sales, a waterfall structure made sense because it was faster and more efficient than a model that obtained bids from all competing exchanges for every impression. If most impressions were sold to an exchange at or near the top of the waterfall, then resources were not wasted seeking unnecessary bids from a large number of exchanges. In DFP as designed by DoubleClick, publishers had the power to rank the exchanges in any order they chose, for example placing those that historically bid the highest or those that had a particularly desirable pool of advertisers at the top of the waterfall. This functionality represented a reasonable compromise between fast and efficient performance, and the publisher's interest in obtaining the highest price possible.

60.     As the programmatic market matured and the internet got faster and more reliable, the inherent inefficiencies in the waterfall became more problematic. In the waterfall, publishers ranked ad exchanges in order of preferred responses, commonly based on average historical CPM bids. The exchange in the top position got the first chance to bid on an impression. If that bid did not exceed the floor price set by the publisher, the opportunity to bid then passed to the second-ranked exchange. A publisher would sell an impression to the first exchange in the sequence that returned a satisfactory bid; other exchanges further down the waterfall sequence may have been able to generate higher bids for the same impression, but the publisher would never know.

61.     Thus, the waterfall disadvantaged publishers: it left money on the table. For example, if a publisher set a floor price of $1.50 and its first exchange bid $1.40, DFP would then look to the second exchange. If the second exchange bid $1.50, the waterfall process would stop. In that case, the publisher would never know if its third exchange might have bid $2.00, its fourth $2.10, and its fifth $2.20. The waterfall was thus less effective at maximizing a publisher's yield on a per-impression basis than a true auction process across all exchanges at once. It also impaired the market from the advertisers' perspective by generating sales to advertisers other than those who placed the highest value on a given impression.

62.     Despite the benefits Google's publisher customers would have received from a full set of bids involving all exchanges, DFP maintained its waterfall. After acquiring DoubleClick, Google made modifications to DFP and AdX to incorporate RTB from AdWords Demand sources, functionality that became the cornerstone for Google's ad tech monopolies. At the same time, it could have replaced the waterfall with a system allowing simultaneous bids from multiple exchanges. It chose not to. There were no ongoing technical limitations that required Google to maintain the waterfall—processing power and network transmission speed had improved, the

21

software for generating bids had matured, and there was significantly less risk that obtaining multiple bids would create unreasonable latency.

63. Certainly by February 2012, when the OpenRTB protocol became the Interactive Advertising Bureau standard for programmatic ad sales communication, the technology could support simultaneous bids from multiple exchanges. Yet, rather than adopt a system that would benefit its publisher customers, Google maintained the sale structure that gave it maximum control over the final transaction. Publishers knew that DFP was costing them revenue. In a competitive environment, undoubtedly many of them would have switched from DFP to a publisher ad server that improved their returns—for instance, one that offered a unified auction for exchanges instead of strictly a waterfall, but Google's tie between AdWords Demand (via AdX) and DFP gave publishers no choice but to stay with DFP to maintain access to this essential demand source.

64. DFP's ongoing use of a waterfall profoundly impacted TRUSTX and other smaller AdX competitors. Exchanges that ranked higher in each publisher's waterfall had materially better chances of securing impressions than exchanges further down in the rankings. Indeed, exchanges ranked further down in the waterfall would often not even have the opportunity to bid on the most desirable impressions because those impressions were sold to a higher-ranking exchange. This created a paradigm that made the spawning of new exchanges and bringing more competitive players into this market exponentially more difficult.

65. This dynamic had the self-reinforcing effect of protecting established exchanges, including AdX (which also benefitted from additional preferences granted by Google such as First Look, discussed below) over new market entrants because publishers would naturally tend to place exchanges with established win rates higher in the waterfall than untested competitors. Even if competing exchanges, such as TRUSTX, offered superior transparency and data sharing, improved

features, or better prices, they faced significant challenges convincing publishers to modify their waterfall rankings to allow those exchanges to compete for bids on a level playing field.

66.     In addition to protecting AdX, Google maintained the DFP waterfall because that structure created opportunities for manipulation of the outcome to benefit Google in ways that would not have been possible with open competition among ad exchanges. Sales occurred at the first step where an exchange returned terms satisfactory to the publisher. Because this was a yes/no transaction involving only two parties with a price that was disclosed to AdX, Google maintained control over the final outcome in a way that would have been impossible in a fully competitive market involving multiple simultaneous bids. Google exploited that control through a series of anticompetitive initiatives that established its unrivaled dominance over the entire programmatic ad tech stack.

**c.     DFP's "First Look" Established Unmitigated Favoritism for Google's AdX.**

67.     Before 2010, publishers selling inventory through DFP across multiple exchanges faced no built-in biases favoring one exchange over another. Once the publishers ranked their exchanges and established the waterfall sequence, DFP executed the waterfall in accordance with that ranking. A publisher could rank an exchange high if the publisher favored the specific ads featured by that exchange—*e.g.*, high-quality advertisers or low levels of fraud. Alternatively, a publisher could reward exchanges that returned high prices for its impressions. Or it could demote exchanges whose advertisers' ad quality or bid prices declined. Google abolished this even-handedness and replaced it with a policy that gave strict preference to AdX.

68.     In 2010, Google introduced a program called "Dynamic Allocation" that artificially advantaged Google's AdX within the waterfall. A key feature of Dynamic Allocation was that DFP gave AdX an exclusive, first-in-line advantage over all other competitor ad exchanges in the waterfall system. Although Dynamic Allocation was billed as a way to improve publisher yield by

23

putting upward pressure on the price for a given impression (also called a "CPM"), it ultimately *reduced* publisher's yield while giving Google a financial and competitive advantage.

69.    Dynamic Allocation effectively gave AdX a preference over competing sources of demand, a preference known as "**First Look**." With "First Look," whenever a publisher's non-guaranteed impression became available, AdX had an initial opportunity to acquire that impression, before competing exchanges were allowed to generate bids. If AdX could provide a bid that exceeded the publisher's floor price for that impression, AdX won the sale, bypassing any other ad exchanges' ability to participate and compete for the impression.

70.    In 2014, Google strengthened the anticompetitive nature of Dynamic Allocation by implementing Enhanced Dynamic Allocation. The "enhancement" was that Google expanded Dynamic Allocation to allow Google's AdX to run an auction before placing an ad associated with a direct deal with an advertiser. Thus, First Look, through Enhanced Dynamic Allocation, forced publishers to let AdX compete at an advantage with publishers' direct deals.

71.    First Look ultimately impacted not only direct sales and sponsorships, but all programmatic ad sales through DFP. With First Look, AdX had the first opportunity to generate a bid for each impression, effectively giving AdX a right of first refusal over all impressions. Even if the publisher wished to rank a different exchange higher in the waterfall, DFP would start by seeking a bid from AdX. At that point, if AdX had an advertiser who was willing to meet the publisher's requirements, the sale would occur and no other exchanges in the waterfall would have the opportunity to bid.

72.    Given DFP's enormous market share among publishers, First Look resulted in AdX receiving access to the majority of impressions available for programmatic ad sales across the entire web before any competitor even got to look at the opportunity. In addition to the inherent

24

advantage in this sequencing, AdX obtained an informational advantage because it received RTB data associated with the available ad space and the user. With this data, AdX had the ability to cherry-pick the most desirable impressions, favoring its exchange and leaving rival exchanges with the least desirable impressions for their advertisers. And because rival exchanges were not given the opportunity to generate an RTB at this step in the process, they were unable to adjust bids as AdX could.

73.    Instead of communicating with rival exchanges and generating RTBs to the benefit of publisher yield and competition, DFP relied on historical estimates of what each rival exchange in the waterfall would be likely to bid and used those estimates as the floor price that AdX was required to meet for its own bid to be successful. In other words, AdX had the opportunity to analyze and submit competitive bids based on real-time data on an impression-by-impression basis but only had to exceed averages of entire blocks of impressions from other exchanges in order to win the impression.

### d.    Google Refused to Share User Data with any Exchange Other than AdX.

74.    Google also created a built-in advantage for AdX by making it the only exchange that could receive the user IDs generated by DFP for each impression. Such IDs allow ad tech tools to identify characteristics of certain users, such as browsing history, that may suggest that the user is a particularly desirable target for certain advertisements. When available, ad exchanges and DSPs use this information to adjust bids in appropriate circumstances and are often willing to bid more for what is considered a more attractive impression.

75.    Google's "first-party data" about users, including user identifiers, provides exactly this type of targeted ad information. Google encrypts this data such that it can only be deciphered and used by Google's own ad tech tools, including its advertiser servers, its publisher ad server, DFP, and its exchange, AdX. As a result, advertisers working with Google's tools have additional

information that regularly increases these advertisers' bids. Google refuses to share this data with any other ad exchange, including TRUSTX, which must generate bids based on more limited information. The lack of first-party data tends to depress bid amounts from rival exchanges compared to bids from AdX, causing the rival exchanges to lose additional transactions to AdX.

76.     Google explains its encryption of user ID information as necessary to protect user privacy. This justification is pretextual. The users in question are accessing the *publisher's* website, not Google's. And Google utilizes the user IDs in operating its own ad exchange AdX, reflecting that there is no privacy justification for not providing the user IDs to Google's competitors. Instead, encrypting user IDs effectively blocks publishers from using important customer data for advertising sales conducted through any channel other than Google. Because publishers depend on their ability to sell advertising space that is tied to characteristics of specific users, publishers are forced to use Google instead of competitor ad exchanges, like TRUSTX. Google thus cites privacy as the motivation for its actions that were designed to and did in fact hinder competition.

### e.     Google's Access to Advertising Data Creates a Self-Perpetuating Market Advantage.

77.     Through its dominant market position over each element of the ad tech stack, Google obtains access to enormous quantities of data about advertising sales. Data analytics are essential to programmatic ad sales—more data inevitably supports more sophisticated and accurate analysis. Google's insights into such a large proportion of programmatic ad sales, including ad sales that ultimately occur on other exchanges, entrenched its market power.

78.     After obtaining its market power through exclusionary and anticompetitive conduct, Google now extracts an ongoing market advantage from the sheer number of transactions that flow through its exchange and other tools. TRUSTX and other competitors are not competing

with Google on a level playing field. As the U.S. District Court for the Eastern District of Virginia has held, "[t]he unmatched scale that Google has achieved across the open-web ad tech stack helps the company test products more quickly and make higher-quality matches between advertisers and publishers." *Ad Tech Liability Op.* at 832.

### C.    Google Implemented Project Bernanke to Maintain Its Monopoly Power and Ensure AdX Won Impressions Over Competitor Exchanges.

79.    From at least 2013, Google has designed and implemented several quasi-clandestine projects to exclude rival ad exchanges and strengthen AdX's dominance by adjusting bidding behavior and take rates in AdX to manipulate auctions and funnel impressions away from competing ad exchanges even when advertisers on those exchanges were willing to bid more. These projects are known by codenames: Projects Bernanke, Global Bernanke, Bell, and Alchemist. The goal of these initiatives was to deprive competing ad exchanges of the volume and scale required to compete with AdX.

80.    These projects relied on the distinction between different auction models known as first-price, second-price, and third-price auctions. While the winner in all three auctions is the highest bidder, the determination of the amount that winner will pay differs between the models. In a first-price auction, the winner pays the amount of its own winning bid regardless of how that bid compares to any of the other bids. In a second-price auction, the winner pays not the amount of its own bid, but the amount of the second-highest bid, sometimes plus one cent or another small increment. And a third-price auction results in the winner paying the third-highest bid stemming from an AdX auction (again, sometimes plus one cent or other increment) as long as the third-highest bid was above the publisher's price floor.

81.    From 2010 to 2019, Google publicly stated that AdX conducted second-price auctions. But in 2013, Google launched a secret program called **Project Bernanke**, which

clandestinely transformed AdX auctions from second-price to third-price auctions. Google kept this project and subsequent iterations of it, and details about their mechanisms, secret. Google did not disclose the existence of these projects to publishers, advertisers, rival ad servers, or rival exchanges. And rival exchanges had no way of knowing that Google was using information from DFP to alter the bids channeled through AdX.

82.     Through Project Bernanke, Google exploited how AdWords bid into AdX. When Google identified a less competitive auction in which AdWords submitted the top two bids, it charged the top bidder the price bid by the second AdWords bidder but then remitted to the publisher (through AdX) an amount equal to the *third* highest bid. Thus, publishers were unwittingly paid amounts that reflected third-place bids rather than second-place ones, and consequently, suffered reductions in revenue of as much as 40 percent. Google, through its ad-buying tools like AdWords, continued to charge the winning advertiser as if it had won a second-price auction, and Google's ad-buying tools then retained the difference between the second- and third-place bids.

83.     In other words, under Project Bernanke, the advertiser with the winning bid paid the price of the second-highest bid, but the publisher would receive a payout equal to the third-highest bid, with Google's ad-buying tools retaining the difference.

84.     Google then placed the price differential into a pool. When Google identified a more competitive AdX auction for the same publisher, it would deploy funds in its pool from less competitive auctions to subsidize Google's advertiser's bid and win the auction, even though another ad exchange's advertiser may have actually submitted a higher bid. This scheme helped Google's advertisers win impressions on AdX that otherwise might have gone to advertisers using non-Google ad-buying tools. The extra money amassed through Bernanke increased the number

of impressions transacted in AdX, and also caused a 20% increase in the win rate of Google ad-buying tools.

85.    In August 2015, Google launched a revised version of Project Bernanke called **Global Bernanke**, which accumulated the differentials between the second- and third-place bids from all publishers in one pool and then used that sum to manipulate bids across multiple publishers, rather than on a publisher-by-publisher basis. Global Bernanke thus inflated the bids of Google's advertisers who were otherwise likely to lose an auction due to hugging a publisher-set price floor on AdX. When advertisers hug the floor price, they risk their bids being rejected if, after the ad exchange takes its commission ("take rate"), the net bid falls below the floor. But with Global Bernanke, Google subsidized these at-risk bids and kept AdX's win rate high.

86.    Meanwhile, in or around 2014, Google implemented another iteration of the Bernanke program with a version called Bell. Under **Project Bell**, Google first determined whether a publisher provided AdX with an opportunity to bid on inventory prior to other exchanges through Dynamic Allocation or Enhanced Dynamic Allocation or whether, on the other hand, the publisher tried to partner with rival ad exchanges.[3] If the publisher did not give preferential access, Project Bell re-structured the auction from a second- to third-price auction, thereby decreasing the publisher's AdX revenue without any input from or awareness from the underlying advertiser. Bell then used the differential to inflate the bids returned to publishers who did choose to give preferential access to AdX. In other words, Bell penalized publishers who did not grant AdX preferential access by paying them based upon the third-place bid rather than a second-place bid,

---

[3] Around the time that Bell began, some DFP publishers could avoid Enhanced Dynamic Allocation, but by 2016, Google had enrolled every DFP publisher in Enhanced Dynamic Allocation, which afforded AdX a right of first refusal over publishers' ad spaces. Google never created an "off" switch for Enhanced Dynamic Allocation, and while Google has observed it is "technically possible" for publishers to use a "workaround" to avoid it, Google does not believe that workaround is widely used.

while using the difference to increase the bids made to publishers who allowed preferential access. In the process, Bell artificially and anticompetitively disadvantaged rival ad exchanges.

87. In 2019, Google shifted to a first-price auction—in which the winning bidder pays its own bid—and implemented Unified Pricing Rules—described in Section V.D, *below*. These shifts required Google to make significant changes to Project Bernanke and its iterations to maintain the desired effect in the first-price auction realm. To maintain its anticompetitive advantage, Google created **Project Alchemist**, a first-price version of Project Bernanke, to ensure that it would maintain its unfair advantage over rival ad exchanges under these new auction rules. Project Alchemist had to account for differences in a first-price and second-price auction. Google could no longer manipulate the price of the second-place bid to impact the amount paid by the winning bidder. Instead, Google would manipulate its ad-buying tools' margins to again allow Google to win more impressions. Project Alchemist implements a similar scheme to Project Bernanke, underpaying publishers to build up a pool of funds for its ad-buying tools to use to displace higher bids from rival exchanges. Project Alchemist was a new and independent act that had the effect of leaving rival exchanges with fewer, lower-value impressions.

88. Project Bernanke (and its subsequent iterations) increased annual AdX revenue by $230 million, with Bell alone generating an additional $140 million.

89. This Court has previously found that allegations regarding Google's use of Project Bernanke, including Global Bernanke, Bell, were "anticompetitive measures that harmed competition in the ad-exchange market by using AdX to selectively transact publishers' higher-value impressions and leaving lower-value impressions for competing exchanges." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 389 (S.D.N.Y. 2022).

**III.    TRUSTX, Backed by Prominent Publishers, is a Premium Marketplace Designed to Restore Trust and Transparency in Programmatic Advertising.**

90.    Founded by 30 prominent members of Digital Content Next, TRUSTX is the industry's only public benefit exchange (B-Corp) designed to secure the full value of media investment by offering a premium, transparent, and brand-safe exchange. When TRUSTX was founded in early 2016, fraud, non-transparent buying practices and the allure of cheap costs per mille ("CPMs") had converged, drastically diminishing standards of quality, performance, and a genuine value exchange between publishers and advertisers—challenges that continue to persist in programmatic advertising, especially with Google's anticompetitive conduct undermining competition.

91.    Dedicated to fostering trust, transparency, and brand safety, TRUSTX sought to address these challenges by offering a premium private marketplace with a direct-to-publisher model, delivering a transparent supply chain that is 100% human and viewable and that is free of made-for-advertising content. This was not merely a policy aspiration—it was a founding commitment enforced from TRUSTX's first day of business through Digital Content Next membership requirements and rigorous publisher vetting. Made-for-advertising—marketplaces that included advertisements with little or no original editorial value—proliferate across the open web and degrade the quality of programmatic inventory available through other exchanges, including AdX. By prohibiting made-for-advertising inventory, TRUSTX ensures that impressions available through its exchange came from legitimate publishers with genuine audiences and quality editorial content. Whether via run-of-network, one-to-one deals, or contextual PMPs, TRUSTX offers a range of buying options that help publishers reach their audience effectively and sustainably, as measured by Scope3, in premium, brand-safe environments.

92.    TRUSTX's marketplace value was and remains real and is well recognized by

31

market leaders. With the backing of 30 prominent publisher members of Digital Content Next, TRUSTX has attracted many of the world's most respected lifestyle, sports, entertainment, tech and news brands, enabling the platform to fulfill its mission while offering programmatic advertising at scale through a direct buyer-to-seller connection. TRUSTX's premium sellers include some of the most prominent publishers worldwide, such as ABC, CBS, CNN, Dotdash Meredith, Disney, ESPN, Fox News, NBCUniversal, Paramount, Politico, Vox Media, The Washington Post, Warner Bros. Discovery, and many others. The TRUSTX platform has over 3,000 publisher domains representing prominent brands.

93.    After TRUSTX's marketplace launched in May 2017, it quickly grew to more than 5 billion monthly human and viewable impressions within a year. By early 2018, TRUSTX attracted additional funding from CBSi, ESPN, Meredith, Fox News, and NBCUniversal to accelerate the growth of its marketplace.  In May 2024, TRUSTX was acquired by Symitri, Inc., a data intelligence and privacy technology company founded to strike a balance between the data needed by advertisers and publishers and consumer privacy. While TRUSTX operates as a wholly owned subsidiary of Symitri, the acquisition further supported TRUSTX's mission of ensuring the future of the premium, ad-supported open web.

94.    TRUSTX has invested heavily in optimizing technology to fulfill its unique mission. Utilizing third-party technology infrastructure to operate its exchange, TRUSTX has focused its resources on curating premium inventory and maintaining the trust and transparency that distinguish its marketplace from competitors. As a result, TRUSTX is a trusted alternative to platforms like Google by offering, among other things, a transparent and efficient marketplace. Despite TRUSTX's substantial investments and competitive offerings, Google's anticompetitive conduct severely constrained TRUSTX's share of programmatic advertising sales and foreclosed

competition by TRUSTX.

95.     Publishers were effectively forced to use DFP as their publisher ad server because they could not forgo access to the AdWords Demand that was only available to users of DFP. With DFP as their ad server, publishers were also forced to give AdX a "First Look" at all impressions, allowing Google to secure transactions for the most desirable impressions before TRUSTX even had a chance to bid on the opportunity. Even if a publisher identified TRUSTX as its preferred, first-in-line exchange, DFP's requirement that AdX have an initial opportunity to make the sale merely by beating a generic bid based on historical averages denied TRUSTX the chance to sell the most valuable impressions.

96.     Google's market power in the ad exchange market is also clear from pricing relative to TRUSTX. AdX's take rate was among the highest in the industry, averaging 20%. As a public-benefit corporation committed to transparency and the elimination of hidden fees, TRUSTX maintained a materially lower take rate. Despite these lower costs and despite the clear advantages from TRUSTX's cooperative structure, curated marketplace, and commitment to brand safety and ethical programmatic advertising, AdX continued to dominate programmatic ad sales. Google's dominance was not the product of superior technology or service, but rather the result of its anticompetitive conduct, which deprived TRUSTX and its publisher members of the revenues and scale necessary to fulfill their mission of ensuring a sustainable future for the premium, ad-supported open web.

97.     Google's conduct was particularly harmful to TRUSTX because of at least two compounding factors unique to TRUSTX. First, because TRUSTX's publisher base consisted entirely of prominent Digital Content Next members who almost universally used Google's DFP, the percentage of TRUSTX auctions affected by Google's anticompetitive conduct was higher for

TRUSTX than for other exchanges whose publishers had more diverse ad server relationships. Virtually every TRUSTX publisher was locked into DFP; every TRUSTX auction was therefore subject to Google's manipulation. Second, because TRUSTX prohibited made-for-advertising content, its inventory commanded and deserved premium CPMs that mixed-inventory exchanges could not match. Google's conduct—steering demand to AdX regardless of inventory quality—commoditized TRUSTX's premium inventory and suppressed the CPM premium TRUSTX should have earned. As a result, the per-auction harm to TRUSTX was particularly severe, especially when compared to exchanges with mixed or lower-quality inventory.

IV.    **TRUSTX Responds to Google's Exploitation of its Market Power by Competing through the Innovation of "Header Bidding."**

98.    As explained above, Google exploited its control over the waterfall within DFP to advantage AdX over TRUSTX and other rival exchanges. AdX's ability to acquire any impression first, before any other exchange was allowed to see the opportunity, was a monumental advantage. AdX secured transactions merely by exceeding estimated bids calculated by DFP rather than genuine RTBs reflecting information about the specific impression on offer. Because the rival exchanges' estimated bids could not, by definition, adjust in response to a particularly valuable opportunity, AdX had the ability to cherry-pick the most desirable impressions merely by beating bids that were priced based on historical averages.

99.    As is often the case in technology-based industries, disruptive innovation found a way to partially solve the problem by mitigating the effects of Google's self-preferencing of AdX. TRUSTX and other rival exchanges joined with other non-Google market participants to lead the implementation of a technological work-around called "header bidding" (sometimes called "pre-bidding" or "tagless bidding").[4] Although TRUSTX had no knowledge of the means Google was

---

[4] The term "header bidding" arose because the code required to implement the process was placed in the header section

34

using to favor its own ad tech tools (means which were concealed within the DFP black box, among other protections), it knew that the waterfall was inherently inefficient and leaving money on the table, and it could see that Google commanded an outsized share of open web ad sales. Accordingly, TRUSTX and other industry participants developed the basis for a market that could operate even-handedly. Header bidding helped publishers escape both the waterfall's inefficiencies and Google's domination by providing the opportunity for RTBs from multiple demand sources before the publisher's ad server was called. For those publishers who used DFP as their ad server, header bidding allowed the publisher to conduct a real-time auction between multiple exchanges rather than rely on a waterfall in which AdX was always called first.

100.   **Header bidding** uses JavaScript code, called a "wrapper," which publishers add to their websites. When a user opens a page in a browser window, the code "wraps" around the ad server call, making it wait via a timer. While the ad server call is waiting to execute, the wrapper coordinates with various services/vendors (providing impression-related information such as privacy settings, identity, floor pricing, etc.) that add supplemental information before sending ad requests to one or more bid adapter partners, like ad exchanges or ad networks selected by the publisher. The exchanges and other bidding adapter partners return to the publisher one or more bids for the impression(s) available; the wrapper collects all of the bids received and sends the bid information (including bid amount, bid adapter partner name, Deal ID, etc.) via parameters called "key-values" to the publisher's ad server.

101.   For header bidding, line items in the publisher's ad server that are typically used to oversee demand for direct insertion of display ads (advertiser, targeting, budget, price, creative, etc.) are repurposed to teach the ad server that price = 300 and bidder = TRUSTX means "this is a

_____

of the webpage code, between the <head> tags.

$3.00 bid from TRUSTX" so that the bid can be effectively compared to bids from alternative sources (AdX, other bidders, or direct demand from the publisher). There are limitations on the number of line items that can be created for a header bid, a limitation that is controlled by Google through DFP. This restriction is known in the industry as "price granularity." As a result of the Google-imposed limits on price granularity, header bidding remains less efficient than AdX at communicating information about the bid.

102.    As an example, DFP may limit each order to 1000 line items. At $0.01 per line item, the header bidding wrapper could only represent fully-accurate information to the ad server about bids from TRUSTX between $0.01-$10.00. A bid above $10.00, say $15.00, is rounded down in the DFP competition to $10.00. AdX could win the impression for $10.01. Although header bidding is an improvement over alternatives that permit no RTB whatsoever, the line-item setup in DFP forces high bids to be rounded down, negatively impacting both publishers' revenues (when AdX secures a transaction merely by beating the highest header bidding line item rather than an actual bid that is higher) and the volume of sales transacted at exchanges other than AdX.

103.    Notwithstanding these detrimental limitations, header bidding benefits rival exchanges because the wrapper's bid requests include information about the specific impression being sold. As a result, the exchanges can generate RTBs that respond to the strengths of an individual impression. With a header bid, rival ad exchanges could compete somewhat more effectively (notwithstanding the limitations above on price granularity) on price for each impression with AdX because those exchanges could generate RTBs, as Google had always allowed AdX to do.

104.    Header bidding was first introduced in approximately 2014 and grew in popularity and importance over the following years. The integration was popular because it worked. It

increased publisher revenue and yields by broadening RTB competition beyond AdX, and it significantly increased the share of programmatic advertising transactions sold through rival exchanges.

105. Like other market participants, TRUSTX used header bidding technology as a means of providing buyers a direct path to premium publisher inventory. TRUSTX focused on Prebid—a direct, non-intermediary path—as the primary header bidding channel through which buyers could access its member publishers' inventory. By routing demand exclusively through these lower-cost, more transparent channels, TRUSTX ensured that its foundational principles of providing a premium, transparent, and brand-safe exchange were preserved in the header bidding ecosystem.

106. Using header bidding, publishers were able to compare the best bids from multiple exchanges simultaneously rather than merely selling to the first exchange in the waterfall that was able to clear the minimum floor price. As a result, TRUSTX achieved some success in strengthening its market position. Header bidding helped level the playing field to some extent by avoiding some of the inefficiencies and yield-depressing effects of allowing Google to "take" the impression based on the rival exchange's historical average bid prices. And header bidding allowed advertisers to respond dynamically with the actual value they placed on a particular impression—something that only Google previously had the ability to do with dynamic allocation. However, the benefits of header bidding technology were quickly countered by Google's existing auction advantages and its reactive measures to this industry innovation, as described below.

107. Despite its strengths, header bidding was still a compromise solution that failed to put competitor exchanges on a truly equal footing with Google. Even with these technological innovations and clear benefits to its customers, TRUSTX, like other rival exchanges, never had

the ability to truly compete with Google's ad tech stack on an equal footing. Although header bidding did create the ability for rival exchanges like TRUSTX to generate RTBs, those bids were always generated blind, with no knowledge of the other bids in the system and an understanding of what amount would win an impression. In addition to the ongoing advantages flowing from Google's control over the "black box" final decision logic within DFP, header bidding created burdens for publishers that negatively impacted ad exchanges relying on the technology.

108. Websites evolve over time—publishers change the design and formatting of their pages in ways that are both subtle and dramatic. For an ad exchange to match available ad space with an appropriate ad, the exchange must have accurate information about the dimensions and visual characteristics of the space. Consequently, publishers must update their ad servers to reflect any changes to the website design. Google's actions that caused TRUSTX and others to develop header bidding effectively required publishers to do this work twice: once to update the configuration settings within DFP and then a second time to update their header bidding wrapper. Over time, ad exchanges relying on header bidding found that many publishers were slow to update the wrapper, causing problems identifying an appropriate ad to fill the available space. The need to contend with this "website drift" was the direct result of Google's refusal to allow rival ad exchanges to compete fairly within DFP.

## V. Google Exploits Its Market Power to Crush Competition from Header Bidding.

### A. Last Look and SSDRS

109. Google recognized the impact that header bidding was having on AdX's dominance. As the U.S. District Court for the Eastern District of Virginia found, "Google was wary of header bidding, seeing it as a risk to its revenue model that relied upon AdX having a real-time First Look at publisher inventory." *Ad Tech Liability Op.* at 828. Internally, Google conceded

38

that header bidding was a "no-brainer for publishers to adopt" given the substantial revenue gains it delivered, and, accordingly, senior Google ad executives viewed the technology as an "existential threat" to its ad tech dominance, recognizing that it could diminish AdX's transaction volume and undermine DFP's central position. *Id.* at 828, 830. Rather than competing on the merits by lowering AdX's 20% take rate or simply allowing other exchanges to compete with AdX on a level playing field, Google doubled down on its exploitation of market power over sell-side ad servers to advantage AdX over rival exchanges.

110.    Even before header bidding became widely adopted, Google used its market dominance to lobby the primary industry standard organization, the Interactive Advertising Bureau, against endorsing the header bidding standard, Prebid. After those efforts failed, Google used its control over DFP to impose a variation of First Look called "Last Look."

111.    Anticipating the demise of First Look, Google replaced First Look with a "Last Look" for Google. In essence, Google refused to allow AdX to play by the same rules as any other exchange.

112.    With **Last Look**, when a publisher using DFP sent ad spaces to a header bidding auction, the publisher still had to inject the winning bid from that header-bidding auction into DFP as a price floor. At that point, rather than allow AdX to simply compete on a level playing field, DFP *informed* AdX of the winning bid and allowed AdX—and AdX alone—a last chance to outbid the winner of the header-bidding auction. Instead of competing in the header bidding auction with rival exchanges, AdX, through its Last Look technology, was able to generate a bid to win after the auction process completed by waiting to see the final price and then bidding just above that price. Google was able to stay on the side lines and wait until the market created the clearing price and then give itself the ability to win the impression at a slight increase to the clearing price. By

owning the ad server and forcing the business terms, Google could opt out of participating in an open auction and still win at a known target price. This information asymmetry gave AdX an ongoing non-market advantage compared to rival exchanges as they could scoop the impression.

113.   With Last Look, Google gave AdX the final opportunity to generate a winning bid for any impression served through DFP. AdX was able to exercise this opportunity after the winning bid from all other exchanges had been determined and the amount of that competing bid was visible to AdX. "In what was otherwise a sealed auction, Last Look let AdX open the envelope for the winning bid, know what the winning bid was and be able to bid after everybody else." *Ad Tech Liability Op*. at 829 (internal punctuation omitted). This system "significantly disadvantaged other competitors in the ad exchange space." *Id.* (internal punctuation omitted).

114.   In addition, Google's dominant market share was self-reinforcing. By operating the ad server and leveraging its "perfect" information, it could inform its ad exchange, the world's largest by volume, providing enormous amounts of data about ad sales and the behavior of publishers and advertisers to create better algorithmic models and optimize margin. Google exploited this information to land yet more volume and further entrench its market dominant position, putting its competition at an information disadvantage. It also guaranteed to advertisers that it could win the impression if the advertiser was willing to pay a slight premium. This certainty reinforced for advertisers that they had no choice but to spend their money with Google. By not having to compete in header bidding on equal footing, Google withheld the true price an advertiser was willing to pay and could instead pay just a fraction more than any other exchange, without being concerned about a counterbid. This fundamentally uncompetitive practice excused Google from the open market. All other SSPs had one hand tied behind their backs.

115.   For Google, these competitive advantages against header bidding, including Last

Look, were not enough. Seeing some erosion in its market share in favor of rival exchanges, like TRUSTX, Google internally identified header bidding as a significant threat to its ability to maintain its market power and thus to continue charging supracompetitive prices and to continue imposing unfavorable policies on publishers and advertisers. To protect its position, Google exploited the informational advantage afforded by Last Look and the perfect information in the DFP to manipulate its bids just enough to overcome the competing offers that TRUSTX and other rival exchanges had generated through header bidding.

116.    Google exploited this information advantage over rival exchanges by imposing a new policy it called **"Sell-Side Dynamic Revenue Share" or "SSDRS."** Under this policy, armed with the information about its competitors' highest bid, AdX would adjust its take rate to manipulate an advertiser's net bid in ways that would advantage Google and disadvantage its competitors and other participants in the market.

117.    Ad exchanges—including AdX—win ad spaces by submitting the highest net bid, *i.e.*, the gross bid offered by the advertiser less any fee charged by the exchange. Under SSDRS, AdX, with a line of sight into all competing bids, altered its own take rate—the percentage fee it charged—on a per-ad basis. For example, when AdX had a buyer whose net bid was less than the header bid by a relatively small amount, AdX could lower its 20% commission thereby increasing the net bid just enough to guarantee that AdX won the impression. Using SSDRS, Google succeeded in winning a material number of additional impressions by calculating the necessary reduction in its take rate or "margin" to render the net bid sufficient to top the winning header bid. In essence, Google was willing to take a slight hit to its revenue to book the sale and increase the volume of transactions in its exchange. This conduct increased Google's gross revenue and further compelled advertisers to use Google instead of rival exchanges.

41

118.    That is why a Google engineer described SSDRS bluntly as "just yet another way for AdX to exploit the last look advantage," allowing AdX to "pay high and win whenever [a rival exchange] is present . . . and pay low when [the rival] bids low." *Ad Tech Liability Op.* at 870. Rival exchanges could not recreate such a dynamic pricing model because they did not have information on their competitors' bids to inform the decision of when to lower or raise their take rate. This meant that AdX was able to use the information advantage provided by the DFP-AdX tie to win more impressions and prevent its rivals from gaining share and scale to challenge its dominance.

119.    AdX used the same technique in reverse in order to make up for the fees it lost on such sales—when an impression was available for which AdX had a bid significantly in excess of the header bid (or publisher floor price), AdX would *increase* its take rate, and thus Google's revenue, by lowering the net bid without dropping it below the price necessary to clear. Through this mechanism, Google was effectively overcharging advertisers to subsidize its ability to boost certain bids in different transactions, thereby claiming those additional transactions for AdX.

120.    TRUSTX and other market participants had no reason to know of, and could not reasonably discover, SSDRS's manipulation of AdX's take rate on an impression-by-impression basis. Because SSDRS manipulated AdX's take rate both up and down, AdX's average take rate was still 20%—the same rate that AdX had been charging before SSDRS's introduction. Competitors without access to Google's algorithms thus could not discover what SSDRS was doing.

121.    Google also concealed both Last Look and SSDRS from competitors and customers. It never explained SSDRS to publishers whose revenue was impacted by the policy, nor did it tell advertisers about the manipulation of take rates. Because of Google's concealment,

42

competitors, including TRUSTX, had a limited ability to formulate effective strategies for challenging Google's dominance. In short, TRUSTX could not perform equivalent manipulations because, unlike AdX, it was not privy to the knowledge of the "winning" amount that it would need to exceed or an ability to take the impression after all competing bids and the auction had completed. Google continued to conceal these policies from customers and competitors until after Google had ceased employing them or until they were disclosed as a result of litigation.

122.    The combination of Last Look and SSDRS allowed Google to recapture significant market share that shifted to rival exchanges due to header bidding. As the U.S. District Court for the Eastern District of Virginia found, "[t]hrough the advantages provided by Last Look and sell-side dynamic revenue share, Google helped mitigate the risk that header bidding posed to its ad tech products and enabled AdX to remain the world's largest ad exchange." *Ad Tech Liability Op.* at 830.

## B.    Project Poirot

123.    Google also exploited its significant control over buy-side ad tech tools to manipulate the ad exchange market in favor of AdX and away from header bidding. In 2017, as Google employees were expressing concerns about the increasing threat posed by header bidding, Google introduced "**Project Poirot**." This initiative, which Google, once again, concealed even from its impacted customers, relied on discrimination between bids that Google's DV360 ad platform[5] generated for certain rival exchanges and bids that it would have generated for the same impression offered through AdX. By lowering the bids on rival exchanges, Project Poirot provided yet another means for Google to force a shift in advertising sales away from TRUSTX and other

---

[5] In 2010, Google acquired Invite Media, which it renamed "DoubleClick Bid Manager" ("DBM") and later again renamed Display & Video 360 ("DV360"). DV360 is a Demand-Side Platform ("DSP"). As the *United States v. Google* court has found, DSPs "provide large advertisers with significant control over the sources of inventory from which they purchase impressions and how they bid on those impressions." *Ad Tech Liability Op.* at 817.

rival exchanges in favor of AdX.

124.    Project Poirot, like Bernanke described above, also relied on the distinction between two different auction models—here the first-price auctions and second-price auctions. At times, ad exchanges used both auction models for programmatic display ad sales. While the winner in either auction is the highest bidder, the determination of the amount that winner will pay differs between the two models. In a first-price auction, that winner pays the amount of its own winning bid regardless of how that bid compares to any of the other bids. In a second-price auction, the winner pays not the amount of its own bid, but the amount of the second-highest bid, sometimes plus one cent or another small increment.

125.    Each type of auction has advantages for certain situations. A first-price auction incentivizes bidders to try and estimate bids of other participants in order to avoid overbidding, *i.e.*, paying more than necessary to win the auction. A second-price auction eliminates the risk of overpayment and allows bidders to focus only on their own preferred price, which is a more efficient and straightforward process for buyers. In addition, of course, a second-price auction generates a final price that is lower than a first-price auction—a benefit for buyers. However, a first-price auction becomes more attractive to buyers when the auction is only one round in a series of successive auctions for the same item. In that case, a first-price auction will pass along the full amount of the winner's bid to the next round, increasing the bid's ultimate chances of success.

126.    Prior to header bidding, most ad exchanges ran second-price auctions. The winner would pay for the impression not based on its own bid, but based on the amount of the second highest bid plus one cent. Header bidding changed this paradigm. Because the winner of a header bid auction did not directly acquire the impression, but instead had its bid submitted to another auction round at DFP, a first-price structure made it more likely that the winner of the header

bidding auction would also prevail within DFP. AdX itself, because it had the opportunity to win the impression outright with a successful Last Look bid, avoided the need to shift to a first-price model and continued to win impressions based on the second price auction framework.

127.    Google employees understood the implications of header bidding for the auction model and knew that exchanges participating in header bidding were very likely to be conducting first-price auctions. In Project Poirot, Google undertook a massive analysis of pricing data from rival exchanges to discern which were employing a first price model and were therefore presumably engaged in header bidding.

128.    When Google identified such an exchange, it used its control over the bidding behavior at DV360, its popular DSP, to discriminate against the target rival exchanges. Without informing its advertiser clients who were relying on DV360 to manage their advertising purchases, Google caused the platform to "shade," or materially reduce, bids that it generated for any ad exchange that had been identified as holding first-price auctions. When the same impression was subsequently offered through AdX, DV360 would submit a full-price, not "shaded," bid. Of course, this price discrimination shifted sales that would have occurred on a rival exchange to AdX, further harming the rival exchanges by impeding their ability to compete for advertising transactions. Since AdX received a full-price bid, and rival exchanges received a shaded bid, AdX, with the advantage Last Look provided, was frequently able to trump bids generated by rival exchanges.[6] Bid shading directly harmed TRUSTX by causing sales that would have occurred on TRUSTX, generating commissions, to be redirected instead to AdX.

---

[6] In a truly competitive system, identical bids submitted by the same advertiser for the same impression on both a rival exchange and on AdX might clear on the rival exchange for a number of reasons, including that the take rate charged by rival exchanges was generally lower than the 20% Google charged on AdX and the net bid that would be paid to the publisher was therefore higher if the sale occurred on the rival exchange.

129.    Project Poirot succeeded in moving a significant number of advertising sales to AdX and ultimately threatened the viability of competing exchanges. The number of transactions on rival exchanges was reduced by an average of 10% as a result of this initiative. Google was so pleased with the success of these efforts that it introduced "Poirot 2.0," which employed the same discriminatory bidding technique with substantially amplified parameters, reportedly shading bids through first-price exchanges by as much as 90%. As a result, the number of DV360 transactions occurring on rival exchanges decreased, on average, by 15%, causing a significant economic shock to a number of those businesses, as the U.S. District Court for the Eastern District of Virginia has found. *Ad Tech Liability Op.* at 830.

130.    TRUSTX's business somewhat improved from the introduction of header bidding, at least temporarily, but then declined again. Because Google concealed its anti-header bidding countermeasures such as Sell-Side Dynamic Revenue Share and Project Poirot, TRUSTX was unable to determine why its business was faltering. TRUSTX was compelled to invest substantial resources in data analysis and testing of various bid optimization techniques in an attempt to identify and solve the problem. None of this work succeeded in identifying the actual explanations, which were ultimately only revealed when Google was compelled to disclose its internal policies and conduct in litigation discovery. Google significantly increased the pressure on rival exchanges with Poirot 2.0, and the number of transactions closing on other exchanges, such as TRUSTX, continued to decline.

## C.    Open Bidding[7]

131.    Realizing the potential threat that header bidding posed to its stranglehold over the

---

[7] TRUSTX acknowledges that the Court has rejected other plaintiffs' allegations that Open Bidding was anticompetitive. TRUSTX has included additional allegations that show the harm it faces as a competitor in the ad exchange market. Even if the Court views the new allegations as insufficient, TRUSTX includes allegations regarding Open Bidding to preserve the issue for appeal.

ad tech stack, Google devised a plan to coerce publishers away from header bidding and to force ad exchanges to submit bids directly to DFP. Google termed this effort "Project Jedi," after the fictional space knights of the Star Wars franchise who could use powers of mind control to trick others into doing things against their own interests. Google's personnel would continue to talk in Star Wars terms when discussing their plans for Project Jedi, for example calling a strategy to spread misinformation about competing ad exchanges and push publishers to abandon header bidding a "jedi mind trick."

132.    In 2018, Google publicly launched Project Jedi with the innocuous name "Exchange Bidding," and later renamed "Open Bidding." **Open Bidding** allowed publishers using DFP to obtain RTBs for an impression from multiple exchanges. Because Open Bidding generated simultaneous, RTBs from multiple exchanges but occurred entirely within Google's DFP, Google promoted it as a better alternative to header bidding that facilitated competition with competing ad exchanges but reduced latency by holding the auctions on Google's servers. Many publishers adopted it because it allowed them to avoid the work required to configure and maintain multiple header bidding wrappers. Many ad exchanges, including TRUSTX, initially supported Open Bidding. TRUSTX was enthusiastic about Open Bidding when it first launched because TRUSTX thought Open Bidding could be an important new way for publishers to connect with TRUSTX.

133.    But TRUSTX did not know what Google was doing to manipulate Open Bidding behind the scenes. For example, TRUSTX did not know that Google could see the bids of every rival exchange participating in Open Bidding and then AdX would then be given the opportunity to exceed the amount of the winning bid from the Open Bidding round and win the impression.

134.    Even the ostensible benefits, however, were misdirection. Open Bidding was not equivalent to or better for competition than header bidding; to the contrary, it was yet another

attempt by Google to create a system that favored its ad tech over competitors' and undermine the advantages that true header bidding created for rival exchanges. *See Ad Tech Liability Op.* at 829 ("But Open Bidding was not a substitute for header bidding because it discriminated against non-AdX exchanges . . . ."). Google imposed several major drawbacks on competing ad exchanges who chose to participate in Open Bidding.

135.    In addition to effectively providing AdX with a "Last Look" opportunity to bid on the impression after competing bids were already generated, Open Bidding extracted a fee of at least 5% from any transaction that closed on any non-Google exchange, like TRUSTX. Because this fee was not charged for sales occurring on AdX, it had the effect of lowering bids from competing exchanges and reducing their opportunity to win impressions.

136.    Open Bidding also favored Google by providing it with yet more data on ad sales and bidding behavior, including all of the data concerning rival exchanges bids that, with header bidding, would not have been provided to DFP or AdX. Google required other ad exchanges participating in Open Bidding to share their bid data for each impression with Google, though Google refused to share this information with rival exchanges. Google used this data advantage to calibrate AdX's bids and win more auctions.

137.    Further, even if a competing ad exchange won the auction through Open Bidding, Google still required that it facilitate the payment to the publisher. Ordinarily, when TRUSTX wins an auction, it pays the publisher directly, which is a significant touchpoint between TRUSTX and its publisher customers. With Open Bidding, Google effectively disintermediated competitor ad exchanges from publishers, making those publishers even more reliant on Google.

138.    Open Bidding caused harm to competition. It further weakened TRUSTX's market share and ability to grow, which would have improved before Google took anticompetitive action

to undermine header bidding.

### D.    Unified Pricing Rules

139.    By 2019, Google knew it was beginning to face significant antitrust scrutiny related to its dominance over multiple components of the ad tech stack. Internal communications between Google employees acknowledged that the advantages afforded to AdX through the combination of Last Look and SSDRS might be seen as anticompetitive. Google then announced that it would end Last Look, claiming that DFP would place all bidders for ad space on an equal footing. With the elimination of Last Look, TRUSTX expected improvements to its open auction transactions as a result. Then, in May 2019, Google used DFP to impose a new policy that superficially sounded pro-competitive, but, in practice, again favored AdX and prevented TRUSTX's business from flourishing as it would have in a truly competitive environment.

140.    Google designated the new May 2019 policy "**Unified Pricing Rules**." Under this regime, publishers using DFP were prohibited from offering a lower floor price to rival ad exchanges than they offered to AdX for the same impression. Although Google called this "unified" pricing, in truth, the policy did not require uniformity because publishers were allowed to configure DFP to offer a *lower* floor price to AdX than they offered to rival exchanges; publishers were only prohibited from doing the reverse. Publishers could not permit a rival exchange to offer a lower floor price than AdX. Despite the fact that TRUSTX provided incremental value to publishers, as a result of Unified Pricing Rules, those publishers could not offer TRUSTX a lower floor price to clear inventory than they offered Google. In effect, Unified Pricing Rules acted as a "most favored nations" clause requiring publishers to offer each impression to AdX for a price that was no higher than the price offered to any other exchange.

141.    Given DFP's ongoing dominance of the publisher ad server market, Unified Pricing

49

Rules effectively guaranteed AdX that it would receive the most favorable pricing available from the vast majority of publishers. Previously, publishers used price discrimination to prioritize rival ad exchanges, which frequently offered lower pricing, over AdX as a means of, among other things, diversifying their revenue sources and dependence on AdX. Publishers' ability to set a higher floor for AdX than for rival exchanges put downward pricing pressure on AdX because the lower floor on rival exchanges created an inducement for advertisers to choose those exchanges over AdX. In other cases, publishers might favor rival exchanges because of factors other than price, such as providing richer data on sales or offering a desirable set of advertisers.

142. TRUSTX was adversely affected by Unified Pricing Rules. As described above, TRUSTX differentiates itself from AdX through its premium, transparent, and brand-safe marketplace providing a direct buyer-to-seller connection. Prior to Unified Pricing Rules, publishers could have indicated a preference for TRUSTX's premium marketplace by setting a lower floor price for TRUSTX than for AdX, thereby rewarding TRUSTX's cooperative model and differentiated value proposition. Google's imposition of Unified Pricing Rules eliminated such choice. As a result, Unified Pricing Rules undermined TRUSTX's ability to compete on the very attributes that set it apart by foreclosing publishers' ability to express through differential pricing their preference for TRUSTX's premium cooperative marketplace over AdX's long-tail exchange.

143. By prohibiting the 90% of all publishers who use DFP from offering a lower price floor to TRUSTX or any other rival exchange, Google eliminated publishers' ability to favor rival exchanges for reasons other than price. Google's new pricing rules had the effect of shifting yet more business to AdX and away from rival exchanges like TRUSTX: "Unified Pricing Rules increased the number of impressions AdX won and the revenue it received, while decreasing impressions won and revenue received by third-party exchanges." *Ad Tech Liability Op.* at 831.

**VI.    Google Exercises Monopoly Power in the Global Open-Web Display Ad Markets for Both Ad Exchanges and Publisher Ad Servers.**

144.    Google's anticompetitive conduct occurred in two markets that facilitate the placement of open-web display ads. Google's monopoly power in the markets for ad exchanges and publisher ad servers is beyond dispute because the U.S. District Court for the Eastern District of Virginia, after a three-week liability trial, found Google to be a monopolist with dominant power in each market. *See Ad Tech Liability Op.* at 852-856 (finding that Google possesses monopoly power in both the "ad server for open-web display advertising" market via DFP and "ad exchange for open-web display advertising" market via AdX). Google's abuse of its monopoly harmed TRUSTX as a competitor offering open-web ad technology. Because TRUSTX competes directly with Google in one of the two markets that the U.S. District Court for the Eastern District of Virginia has already addressed and because Google's anticompetitive conduct in the second market has also harmed TRUSTX, the same market definitions should apply here.

**A.    Both the Publisher Ad Server and Ad Exchange Markets are Worldwide.**

145.    A worldwide geographic market for publisher ad servers and ad exchanges flows naturally from the borderless nature of internet publisher content and open-web display ads in that content. As the U.S. District Court for the Eastern District of Virginia determined in the *Google Ad Tech* trial, "the relevant geographic market for both the open-web display publisher ad server market and open-web display ad exchange market" is worldwide. *Id.* at 848. "Many U.S.-based advertisers target international Internet users, and many international advertisers target U.S.-based users, including by advertising on U.S.-based publishers' webpages. Similarly, advertisers bid to target international users who visit U.S.-based publishers' pages, and Americans consume digital content from international publishers. Ad tech providers, in turn, built global infrastructure and often manage, price, sell, and track performance of their products globally." *Id.* In the consolidated

antitrust cases concerning Google's digital advertising business, this Court found that, as a result of the U.S. District Court for the Eastern District of Virginia's prior decision, Google is precluded from re-litigating the geographic scope of these markets. Opinion and Order, *In re: Google Digital Advertising Antitrust Litigation*, No. 21-md-3010, Dkt. #1219, (S.D.N.Y Oct. 27, 2025) at 32 ("MDL Op."). TRUSTX markets and sells ad exchange services globally and, therefore, is a participant injured by Google's anticompetitive conduct in the same worldwide market.

**B.      Publisher Ad Servers Are a Distinct Product Market.**

146.     Publisher ad servers facilitate the management and allocation of publisher inventory in the open-web display ad ecosystem. As the U.S. District Court for the Eastern District of Virginia held, "[p]ublisher ad servers for open-web display advertising are uniquely suited for managing ad inventory for large web publishers, are priced differently than other ad tech tools, and are recognized as a distinct product by ad tech industry participants." *Id*. at 834. As a result of their unique use in the online publishing arena, "other ad tech tools are not reasonably interchangeable with publisher ad servers." *Id*.

147.     Publisher ad servers operate differently and have different price mechanisms than other open-web ad technologies, including ad exchanges. *Id*. ("Publisher ad servers, which charge publishers a flat fee per impression sold, are priced differently than ad exchanges, which charge publishers a percentage-based fee per impression sold, and demand-side platforms, which charge advertisers a percentage-based fee per impression purchased.") Publisher ad servers also uniquely serve the needs of web publishers, including "allocating ad inventory between direct sales and programmatic sales; placing ad exchange bids in competition with bids from header bidding, programmatic direct sales, and other ad exchanges; rendering an advertisement on the publisher's webpage for each impression; billing for ads rendered; and providing inventory and revenue analytics." *Id.* at 834.

148. Google itself identified its publisher ad server, DFP, as a unique product until 2018, when it rebranded it under the Google Ad Manager suite. *Id.* at 835. Industry observers and participants also recognize publisher ad servers as unique products. *Id.* During the Google Ad Tech trial, Google's own market definition expert "agreed that publisher ad servers are 'components' of the ad tech stack that 'serve different purposes' from buy-side tools, ad exchanges, and in-house ad tech used by social media companies." *Id.*

149. Publisher ad servers for open-web display advertising are unique from other digital ad technology because they are "capable of performing ad-serving functions for websites, which are essential components" of publishers' revenue streams. *Ad Tech Liability Op.* at 835-36. This is because open-web publishers must monetize their content where the content and users are present and cannot sufficiently do so through other channels like social media or mobile phone applications, which take a substantial share of the revenue for themselves. *Id.* at 836.

150. Revenue derived from monetizing content through open-web display ads is crucial to a publisher's ability to pay staff and fund the creation and distribution of further content. Open-web display advertising also affords publishers greater control and independence because accessibility of their content is not subject to the conditions and algorithms that third-party platforms (*i.e.*, social media) apply to filter and moderate content. Open-web display ads are therefore not reasonably interchangeable with social media, app-based, and instream video advertising and the same holds true for the publisher ad servers that facilitate those ads. *Id.* at 836.

151. In the consolidated antitrust cases concerning Google's digital advertising business, this Court found that, as a result of the U.S. District Court for the Eastern District of Virginia's prior decision, Google is precluded from re-litigating the existence of an antitrust market for publisher ad servers. *MDL Op.* at 32.

53

C.      **Google Possesses Monopoly Power in the Worldwide Market for Publisher Ad Servers.**

152.    As the U.S. District Court for the Eastern District of Virginia held based on evidence submitted at the *Google Ad Tech* trial, Google's publisher ad server, DFP, has a presumptively monopolistic 91% share of the worldwide market for publisher ad servers. *Id*. at 852. Such a dominant market position allows Google to impose monopoly rents from customers and stifle competitors without fear of losing market share or price control.

153.    Google's ability to impose its monopoly power is demonstrated not only by its 91% market share, but also by the significant barriers to entry that support the durability of its position. Notable barriers to entry in the publisher ad server market include the technical and practical difficulties of convincing publishers to switch ad servers or use multiple ad servers and the enormous capital and labor costs needed to develop, manufacture, and maintain publisher ad servers. *See Ad Tech Liability Op.* at 850-51. Through the above-described anticompetitive conduct, Google abused these conditions in an attempt to drive competitors from the market, thus maintaining its monopoly power and rendering publishers with no viable alternative to DFP. *Id*. at 851.

154.    In the consolidated antitrust cases concerning Google's digital advertising business, this Court found that, as a result of the U.S. District Court for the Eastern District of Virginia's prior decision, Google is precluded from re-litigating the issue of Google's market power in the worldwide market for publisher ad servers. *MDL Op.* at 32.

D.      **Ad Exchanges for Open-Web Display Ads Are a Distinct Product Market.**

155.    As the U.S. District Court for the Eastern District of Virginia previously determined based on admitted evidence at trial, "ad exchanges for open-web display advertising constitute a distinct relevant product market." *Id*. at 837. Ad exchanges are distinct from other services and

54

products in the ad tech stack because they connect "publishers using publisher ad servers with advertisers using programmatic buying tools such as demand-side platforms and ad networks" while utilizing "their unique ability to collect and rank ad bids from multiple buying tools in mere milliseconds[.]" *Id*. Ad exchanges are therefore "the only ad tech tool through which publishers can auction their ad inventory at scale and in real-time to the largest sources of programmatic advertising demand" and there is no substitutability with other ad tech. *Id*. at 837-38. For these reasons, "the majority of programmatic ad spending flows through ad exchanges." *Id*. at 838.

156.    The unique nature of ad exchanges is further supported by open-web display market participants like publishers and third-party ad tech developers categorizing them separately from other tools in ad tech stack. *Id*. Google itself "regularly identifies ad exchanges as a distinct product that differs from publisher ad servers, ad networks, and demand-side platforms." *Id*. Nor are ad exchanges that provide a platform for the sale of instream video, mobile apps, or social media ads a reasonable substitute for open-web display ad exchanges. Just as in the analysis of publisher ad server markets, walled garden ads of that nature are not substitutable for publishers that need to "monetize their open-web display inventory" and therefore ad exchanges that facilitate their sale are not substitutable for open-web display ad exchanges. *Id*. at 839. As the U.S. District Court for the Eastern District of Virginia plainly put it, "the only other products that are reasonably interchangeable with an ad exchange that facilitates the sale of open-web display ads are other ad exchanges that facilitate the sale of open-web display ads." *Id*. at 840.

157.    In the consolidated antitrust cases concerning Google's digital advertising business, this Court found that, as a result of the U.S. District Court for the Eastern District of Virginia's prior decision, Google is precluded from re-litigating the existence of an antitrust market for ad exchanges. *MDL Op.* at 32.

E.    **Google Possesses Monopoly Power in the Worldwide Market for Open-Web Display Ad Exchanges.**

158.    As the U.S. District Court for the Eastern District of Virginia observed, "Google possesses monopoly power in the ad exchange for open-web display advertising market" and "Google's AdX has long been the dominant exchange for facilitating open-web display advertising" with a "a market share roughly nine times greater than that of its next-largest competitor." *Id*. at 852.

159.    As direct evidence of Google's monopoly power in this market, AdX for "over a decade" has charged a durable monopoly price of 20% on open-web display ad transactions. *Id*. Despite lower-priced offerings by exchanges attempting to compete, AdX's take rate and market share remained constant over the relevant period. *Id*. This speaks directly to high barriers to entry for true competitors in the open-web ad exchange market resulting from "Google's scale and network effects across the open-web display ecosystem." *Id*.

160.    Google's refusal to even negotiate with publishers over its 20% take rate, despite its own employees acknowledging that the service was "no longer worth 20%," is further direct evidence of its monopoly power. *Id*. at 853. Despite a price materially higher than that of entities attempting to compete, AdX maintains a market share "between 54% and 65% of the market's total transactions" that has "has remained durable over time[,]" a feat unheard of without monopoly power. *Id*. at 855.

161.    Google also shows its monopoly power through its ability to use "its market power in adjacent segments of the ad tech ecosystem to make it more difficult for customers on both sides of the ad exchange market to switch to rival exchanges." *Ad Tech Liability Op.* at 854. This is particularly so on the buy-side by enacting policies that made AdX the exclusive source for AdWords Demand. *Id*. Google made AdX the de facto exchange for AdWords, "despite internal

56

recognition that allowing AdWords to bid on other exchanges would be valuable for AdWords' advertiser customers." *Id*. Because of the essential nature of AdWords Demand for web publishers, Google's actions "helped Google maintain the power to keep charging AdX publishers a 20% take rate." *Id*.

162. Google also restricted AdX so that it could only send RTBs to DFP. This eliminated a desirable AdX feature for non-DFP publishers and entrenched Google's monopoly power in the publisher ad server market. Google took this action "despite requests by customers of other publisher ad servers to access AdX's real-time bids." *Id*. This policy therefore forced publishers to use DFP to access AdWords' unique demand through AdX. *Id*. at 855. As the Court concluded, such conduct is "evidence that Google could set its terms of dealing with its customers 'without considering rivals[,]' and constituted behavior that is 'difficult to explain unless' Google had monopoly power." *Id*.

163. In the consolidated antitrust cases concerning Google's digital advertising business, this Court found that, as a result of the U.S. District Court for the Eastern District of Virginia's prior decision, Google is precluded from re-litigating the issue of Google's market power in the worldwide market for ad exchanges. *MDL Op.* at 32.

## VII. Google Has Market Power in the Worldwide Markets for Buy-Side Tools for Display Advertising.

164. Google monopolized the worldwide open-web display ad markets for both ad exchanges and ad servers in part through conduct in the adjacent, but separate markets for advertiser display ad-buying tools. The markets for ad-buying tools are distinct markets consisting of ad tech tools that enable small and large advertisers to buy various categories of display ads. Google's anticompetitive conduct also involves activities in these buy-side markets. The buy-side markets are distinct from the ad exchange and ad server markets, and Google faces more

competition in them from other tools that allow advertisers to purchase various categories of display ads. But from the perspective of open-web publishers, Google's buy-side tools, including AdWords and Google's DSP DV360, are vital conduits of advertiser demand. Publishers need access to advertiser demand that purchases inventory using buy-side tools, over which Google holds market power, to efficiently fill their ad inventory. Google has sufficient market power in the buy-side markets to distort competition in the downstream ad exchange and ad server markets that serve open-web publishers.

165. The relevant product markets are defined by the functional interchangeability and competitive dynamics of advertiser tools that perform the same basic function: enabling advertisers to bid on and acquire programmatic display ad inventory. While these tools differ in interface, reach, and integration, they share core characteristics. Buy-side tools for display advertising provide advertisers with the ability to manage campaigns, set targeting parameters, and place bids in real time.

166. Substitutes outside these categories, such as manual direct buys or traditional print advertising, are not reasonably interchangeable with buy-side tools for display ads because they lack programmatic functionality and do not offer comparable efficiency, targeting, or scale. Nor are tools used for buying search ads a viable substitute for the products in this market. As the court ruled after the Google Search trial in *U.S. v. Google*, search and display ads have different characteristics and uses, and industry participants (including advertisers) and the public recognize them as distinct. *United States v. Google LLC*, 747 F. Supp. 3d 1, 127 (D.D.C. 2024).

167. As with publisher ad servers and ad exchanges, the markets for buy-side display ad buying tools for small and large advertisers are global in scope (with the same exclusion of countries where the operation of ad tech companies is substantially restricted). Advertisers with

multinational campaigns require tools that allow for the purchase of impressions across geographies in real time. Vendors of these tools compete for business worldwide, and advertisers typically deploy a single DSP or campaign management platform across multiple regions rather than sourcing separate tools for each local market.

### A.    Buy-Side Tools for Small Advertisers Are a Distinct Product Market.

168.    Buy-side tools for small advertisers is a relevant product market. Tools for small advertisers provide a web interface for advertisers to bid on and purchase open-web display inventory through both exchanges and networks.

169.    Tools for small advertisers have unique characteristics: they allow advertisers to access a simple user interface that enables them to set up display ad campaigns, input bidding strategies, identify the types of audiences they are targeting, and receive reports on the performance of their advertisements. The buying tool then automatically bids on the advertisers' behalf for available ad inventory.

170.    Small advertisers typically only use a single ad-buying tool and do not multi-home across multiple ad buying tools because they lack the sophistication and resources to do so or because their advertising needs are simple enough to be handled by one ad-buying tool. The costs associated with more complex buy-side tools (*e.g.*, DV360) are often out of reach for small advertisers.

171.    Other types of ad-buying tools are not a substitute for ad-buying tools for small advertisers. Small advertisers lack the sophistication to operate more complex tools designed for larger advertisers and advertisers cannot purchase open-web display ad inventory through ad-buying tools for other formats of advertising, such as in-app mobile or social media.

172.    Google's buy-side tool for small advertisers is its AdWords platform (later rebranded Google Ads), the largest self-service ad buying tool in the world, with over one million

59

advertisers by 2007. AdWords aggregates demand from millions of mostly small and medium-sized advertisers, many of whom use it as their exclusive tool for buying digital advertising. Because AdWords advertisers are primarily interested in simple, turnkey campaigns and lack the resources to manage multiple buying platforms, access to AdWords Demand is essential for publishers seeking to monetize their inventory through these smaller advertisers.

### B.    Buy-Side Tools for Large Advertisers Are a Distinct Product Market.

173.    Unlike ad-buying tools for small advertisers, ad-buying tools for large advertisers allow sophisticated advertisers (and/or their respective advertising agencies) to manage complex, targeted campaigns that require significantly more features than are available in ad-buying tools for small advertisers.

174.    Ad-buying tools for large advertisers provide advertisers with precise customization options based on publisher, user, and audience targeting. They also allow advertisers to utilize the advertiser's own data, or first-party data, to optimize their campaigns and allow the deployment of highly customized and specific bidding strategies across multiple markets or demographics.

175.    Ad-buying tools for large advertisers require significant expertise to operate and manage. Accordingly, advertisers that use these tools typically employ dedicated teams with extensive expertise or, more commonly, enlist the support of a third-party advertising agency to manage their campaigns. In addition, ad-buying tools for large advertisers typically require advertisers to meet a minimum monthly spend requirement to access the tools. These monthly minimums can exceed $10 million dollars in advertising spend required per year.

176.    Other ad-buying tools are not substitutes to ad-buying tools aimed at large advertisers because they generally lack the complex feature set of ad-buying tools for large

advertisers and do not provide the same level of customization or data reporting that large advertisers require to manage their advertising campaigns.

177.    Google's ad-buying tool for large advertisers is called DV360, an enterprise demand-side platform used by large advertisers and agencies. DV360 offers granular controls, data integrations, and optimization tools that allow these advertisers to run programmatic campaigns at scale across multiple exchanges. For many publishers, DV360 represents one of the single largest sources of programmatic demand. Large advertisers may also use AdWords (a Google platform commonly used by small advertisers) to supplement their campaign strategies. But the opposite is not true—smaller advertisers are unlikely to use DV360 because they do not have as fine-tuned targeting requirements as large advertisers and cannot afford the attendant cost.

**C.    Google Has Sufficient Power in the Markets for Buy-Side Tools for Display Advertising to Constrain Competition in the Ad Exchange Market.**

178.    Google possesses monopoly power in the market for ad-buying tools for small advertisers. AdWords (now Google Ads) is the largest buyer on AdX, the world's largest exchange, and it accounts for roughly 30% of all web display impressions transacted across any exchange. AdWords provides the primary means of accessing publisher inventory aggregated by Google's publisher-side ad network, AdSense. Few self-service buying tool options remain for small advertisers, and none of these offer AdSense access. Further, Google's monopoly power in the market for ad-buying tools is demonstrated in its refusal to route AdWords Demand into rival exchanges, except in very limited instances. The advertising costs for small advertisers would decrease if AdWords bid into rival exchanges, in part because these exchanges typically charge a lower take rate for bids. Because Google faces no competition for ad-buying tools for small advertisers, Google has not made AdWords' demand available in any substantial form to rival exchanges because it faces no competitive pressure to provide lower prices for its advertiser

customers. Google executives have internally acknowledged that AdX's take rate "would crater" if AdWords bought through rival exchanges.

179.   Google's monopoly power in this market stems from its dominance in the general internet search market. AdWords originated as a buy-side tool for purchasing search ads and, with time, expanded to offer display ads. That expansion allowed Google to extend its market power from search into display ads. Many small advertisers view search ads as a necessary aspect of their overall advertising strategy, and those small advertisers are required to contract with AdWords to gain access to Google's search ad inventory. Further, because small advertisers typically single-home their ad-buying tools (in part, to minimize cost and complexity), those small advertisers stick with the same tool they use for search ads—AdWords—for bidding on open-web display inventory. AdWords is thus "the leading source of small and medium-sized online advertisers, having benefited greatly from being the platform through which advertisers purchase Search ads." *Ad Tech Liability Op.* at 831.

180.   This Court has previously found that plaintiffs with similar allegations "plausibly alleged that Google has monopoly power in" the market for "ad-buying tools for small advertisers." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 378 (S.D.N.Y. 2022).

181.   Google has sufficient market power in the market for buy-side tools aimed at large advertisers to restrict competition in the adjacent market for open-web display ad exchanges.

182.   DV360 is one of the leading demand side platforms. *Ad Tech Liability Op.* at 831. Google's Project Poirot is an indication of DV360's market power. Even though the result of Project Poirot was to dramatically reduce DV360's spend on rival exchanges, Google implemented Poirot because it knew that it would not lose a significant amount of advertiser customers even

though DV360 was no longer effectively bidding into rival exchanges. One major feature of ad-buying tools for large advertisers is the ability to competitively bid into multiple exchanges simultaneously, thus increasing the chances that an advertiser would win an impression on which it bid. Indeed, Google employees worried about potential fallout with customers if the details of Poirot became public, but Google still instituted Project Poirot in secret because it knew its effect, reduced spend on rival exchanges for DV360 advertisers, would not be sufficient on its own to cause customers to stop using DV360.

183. This Court has previously found that plaintiffs with similar allegations plausibly alleged that Google possessed "a dangerous probability of achieving monopoly power in the market[] for . . . ad-buying tools for large advertisers." *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 378 (S.D.N.Y. 2022).

184. From the perspective of publishers, both AdWords and DV360 are "must-have" sources of demand. Without access to the advertiser demand to which these tools provide a conduit, publishers would lose substantial revenue. This dependence gives Google the ability to dictate how and where that demand flows. The U.S. District Court for the Eastern District of Virginia explained that Google itself knew its control over AdWords Demand gave it the power to coerce publishers:

> [AdWords'] ease of use, association with a preeminent Internet company, and ability to place targeted advertisements alongside Search results attracted millions of unique advertisers, including countless small and medium-sized businesses. Although publishers could offer their impressions on non-Google ad exchanges, large publishers were greatly attracted to the unique advertising demand offered by AdWords, and as a result viewed using DFP as essential because it was the only publisher ad server that could effectively access AdX and, consequently, AdWords demand. Google recognized the unique attractiveness of its extensive advertiser demand, and its employees understood that limiting access to AdWords demand in this way "compel[led] publishers" to use AdX and DFP.

*Ad Tech Liability Op.* at 826 (internal citations omitted).

## VIII. Google Abused Its Monopoly Power Through the Implementation of Anticompetitive Policies.

185.    In its post-trial order, the U.S. District Court for the Eastern District of Virginia held that "Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests." *Ad Tech Liability Op.* at 864. TRUSTX brings this complaint to redress harm resulting from Google's same policies, which impaired its ability to compete effectively in the same markets. As described above, each of these policies further entrenched Google's monopolies and thwarted competitors' attempts to gain market share. *See* Sections II.B, II.C, and V, *above*.

186.    The specific policies held by the U.S. District Court for the Eastern District of Virginia to have been actions abusing its monopolies were:

(i)    The tying of AdX with DFP to further leverage the exclusive demand of AdWords. *Ad Tech Liability Op.* at 859-64;

(ii)    First Look, "which required publishers using DFP to offer AdX a first right of refusal for each impression" which "exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." *Id*. at 864;

(iii)    Last Look, "another anticompetitive policy that entrenched Google's monopoly power, disadvantaged Google's publisher customers, and harmed the competitive process" by giving "AdX the ability to see competing exchanges' bids in an otherwise sealed auction [on DFP] before AdX would bid" thereby harming "publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." *Id*.;

64

(iv)    The implementation of SSDRS, the primary purpose of which "was to outbid rival exchanges by using AdX's anticompetitive Last Look advantage." *Id*. at 870; and

(v)    Unified Pricing Rules, "another example of Google exploiting its monopoly power and tying arrangement to restrict its customers' ability to deal with its rivals, thereby reducing its rivals' scale, limiting their ability to compete, and further compounding the harm to customers." *Id*. at 865.

187.    In the consolidated antitrust cases concerning Google's digital advertising business, this Court found that, as a result of the U.S. District Court for the Eastern District of Virginia's prior decision, Google is precluded from re-litigating that the following anticompetitive conduct was used to willfully obtain and maintain its market power in the ad exchange and publisher ad server markets: unlawful tying, First Look, Last Look, SSDRS, and Unified Pricing Rules. *MDL Op.* at 32.

188.    In addition to policies already found by the Court to have been anticompetitive, Google has engaged in the following conduct that unlawfully protected and further exploited its market power:

(i)    Project Poirot, a direct attack on the competitive threat of header bidding offered by exchanges like TRUSTX, which, although the Court held occurred outside the two defined markets and had pro-competitive justifications in certain situations, still "enhanced AdX's market power by adjusting some of DV360's bids in a way that preferenced AdX over third-party ad exchanges." *Ad Tech Liability Op.* at 865 n.29.

(ii)    Project Bernanke, a secret scheme through which Google charged advertisers

65

as if its auction was a second-price auction but paid publishers as if the auction was a third-price auction, retained the difference between the second- and third-place bids, and then used the pool of price differentials to increase the bids of client advertisers to win impressions on AdX that might have otherwise gone to non-Google exchanges and advertisers.

(iii)    Open Bidding, a feature that Google claimed to be equivalent to header bidding but that in fact advantaged Google by imposing additional fees on bids generated from rival exchanges and by providing Google with additional data about sales occurring on such exchanges.

(iv)    Tying AdWords Demand to AdX, prohibiting competing exchanges from accessing this substantial source of market liquidity and further coercing publishers to favor DFP and AdX over ad tech products created by competitors such as TRUSTX.

(v)    Maintaining DFP's use of a waterfall to engage competing exchanges successively rather than simultaneously, prejudicing competing exchanges particularly if they were not already established market participants.

(vi)    Refusing to share first-party data about users accessing publishers' webpages with publishers or competitor exchanges, unfairly advantaging AdX and Google's other ad tech tools when generating bids for specific impressions.

(vii)    Maintaining black-box secrecy over the logic used by DFP when deciding among competing bids for an impression, impairing TRUSTX's and other competitors' ability to maximize the efficiency and effectiveness of advertiser's bids.

66

(viii)   Refusing to share data generated by the enormous volume of advertising transactions that are forced to pass through Google's ad tech technology as a result of Google's anticompetitive conduct. The advantage Google receives from this data has created a self-perpetuating, persistent advantage for Google in its interactions with all aspects of programmatic ad sales on the open web.

## IX.   TRUSTX's Claim Is Not Barred by the Statute of Limitations.

189.   TRUSTX asserts its claim under the Sherman Act, which is generally subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b.

190.   The statute of limitations for causes of action under the Sherman Act is suspended by statute "[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws." 15 U.S.C. § 16(i). The suspension lasts "during the pendency" of the government's litigation "and for one year thereafter." *Id.*

191.   TRUSTX's claim is based on the matters complained of by the Department of Justice in proceedings it instituted on January 24, 2023. *See United States v. Google LLC*, No. 1:23-cv-108-LMB-JFA (E.D. Va.).

192.   Much of Google's anticompetitive conduct occurred within its black boxes for DFP and AdX, such that it was inherently self-concealing. This Court has observed that many of Google's auction-manipulation practices "lacked transparency, occurred out of the public eye, and had effects that were not immediately understood." *In re Google Digital Advert. Antitrust Litig.*, No. 21-MD-3010 (PKC), 2026 WL 91448, at *9 (S.D.N.Y. Jan. 13, 2026) (citation omitted). Instead, Google's anticompetitive acts forming the bases of Plaintiffs' claims were "opaque and not well-understood outside of Google." *Id.*

193.   Though competitors were aware of some of Google's anticompetitive conduct— for example, Google's tying of RTBs from AdX to the use of Google's publisher ad server—they

67

had no way of knowing about many other anticompetitive acts Google took to maintain its monopoly status because Google took affirmative steps to conceal its misconduct.

194. As one example, TRUSTX had no knowledge of Project Bernanke. For years, Google publicly stated that it ran a second-price auction while secretly running a third-price auction and pocketing the difference between the second- and third-auction prices. The first public reports stating at a high level that Google had operated a secret project with the code name Bernanke came in 2021 after Google erroneously filed an unredacted court document, in which Google acknowledged the existence of Project Bernanke and said that "the details of Project Bernanke's operations are not disclosed to publishers." The news reports, though, did not include sufficient detail for TRUSTX to articulate how Project Bernanke worked or understand how they were harmed by it.

195. Google also concealed First Look. Though Google implemented First Look in 2010 as part of its launch of Dynamic Allocation, the initial release information said only that Dynamic Allocation "maximizes revenue by enabling publishers to open up their ad space to bids from multiple ad networks." Google's public statements contradicted the truth: instead of maximizing revenues, First Look actually reduced publishers' yields because, if AdX could generate a bid that exceeded the publisher's floor price for that impression, AdX won the sale without other ad exchanges having the opportunity to compete.

196. TRUSTX was also unaware that AdX was designed to exploit its information advantage through Last Look. In a fair auction, AdX would not be made aware of competing bids before generating its own. But under Last Look, Google took advantage of the header bidding results provided to DFP and used that data to boost AdX's chances of generating a winning bid. As with the other self-preferences that Google built into DFP and AdX, the concept of Google's

68

Last Look advantage was not disclosed publicly until after Google had ceased employing it. Even then, the full details of the Last Look policy, including its scope, purpose, and the harms it caused to TRUSTX were unknown until litigation forced Google to reveal its hand through discovery.

197.    Further, Google concealed its implementation of SSDRS both in its initial rollout and in further public statements. At first, Google concealed SSDRS entirely, operating it covertly for more than one year. When Google publicly disclosed SSDRS in the summer of 2016, Google said nothing about SSDRS's ability to change AdX's take rate on a transaction-by-transaction basis. Instead, Google described SSDRS merely as a method to increase publisher's yields—a false statement. SSDRS in fact had the opposite effect because it enabled AdX to adjust its take rate and submit lower net bids than it otherwise would have in a fair auction, reducing publisher revenue.

198.    Google also fraudulently concealed Project Poirot. Google never disclosed that Project Poirot was arbitrarily shading bids placed by DV360 onto competing ad exchanges, while leaving bids placed on AdX intact. To the contrary, Google took steps to prevent others from discovering Project Poirot. At first, Project Poirot shaded bids by only 10% to 40%. This caused only a modest decline in spend, and one that could be explained away by ordinary noise or other legitimate techniques. After more than one year, Google augmented Project Poirot and began shading bids by up to 90%. By gradually increasing the amount by which Project Poirot shaded bids—and by dynamically adjusting the magnitude to which the bid shading occurred (*i.e.*, the amount of bid shading differed from auction to auction)—Google concealed what Project Poirot was doing and made it impossible for TRUSTX or other market participants to discover that Google was affirmatively reducing DV360 bids.

199.    Finally, Google kept hidden its most recent efforts to harm competition through its Unified Pricing Rules. Though Google announced the introduction of unified pricing rules on May

69

10, 2019, that announcement made competitors believe that all exchanges would be treated "equally" to "maintain a fair and transparent auction." Google hid the fact that publishers were allowed to configure DFP to offer a lower floor price to AdX than they offered to rival exchanges even though they were prohibited from doing the reverse.

200. In general, Google and its employees schemed to destroy any record of their anticompetitive acts in their internal communications. Google used a default "history off" setting for internal chat conversations that auto-deleted messages, even those that should have been preserved following the start of the governmental investigations. Google employees used these "history-off" chats to communicate about business matters even when they knew they were subject to litigation holds that required them to preserve documents. Google employees were also directed to make pretextual claims of privilege, including marking documents as privileged or adding internal lawyers to email chains that did not contain or seek legal advice. The U.S. District Court for the Eastern District of Virginia has already found that Google has a "systemic disregard of the evidentiary rules regarding spoliation" and misuses the attorney-client privilege. *Ad Tech Liability Op.* at 872-73; *see also In re Google Play Store Antitrust Litig.*, No. 20-CV-05671-JD, 2024 WL 3302068, at *15 (N.D. Cal. July 3, 2024) ("The Court determined after an evidentiary hearing held before trial that Google had willfully failed to preserve relevant Google Chat communications, and allowed employees at all levels to hide material evidence.").

201. TRUSTX remained in ignorance about the anticompetitive conduct until after January 24, 2023, when the Department of Justice filed its lawsuit and, as discovery progressed, Google was compelled to disclose its internal policies that revealed TRUSTX was a victim of Google's anticompetitive conduct.

202. TRUSTX remained ignorant despite its diligence in attempting to determine the

70

cause of its harms. TRUSTX invested substantial internal resources in extensive diagnostic efforts, including systematic data analysis of auction outcomes and win rates based on detailed transaction-level data, iterative bid optimization testing designed to improve TRUSTX's position within DFP's auction framework, adjustments to TRUSTX's take rate, and architectural decisions to route advertiser demand through alternative channels and work around DFP's limitations. Despite these substantial efforts, TRUSTX was unable to identify the actual causes of its declining market position and found no answers regarding what Google was doing or solutions to increase the number of successful sales originating within TRUSTX.

203.   Only after the Department of Justice's detailed allegations in its January 24, 2023 Complaint were made public did TRUSTX learn sufficient information to believe that it had been targeted by Project Bernanke, First Look, Last Look, SSDRS, and Project Poirot.

204.   Further, even for certain conduct publicly known earlier, the statute of limitations has restarted multiple times pursuant to the continuing wrong doctrine. In particular, and as described throughout this Complaint, Google engaged in ongoing violations of the Sherman Act post-2019 that inflicted continuing and accumulating harm.

205.   Google's tying of AdWords Demand to AdX is a continuing violation. Google continues to apply that tie to the billions of auctions Google unfairly won within the statute of limitations due to this tie. Google's continued maintenance of the tie is not a consequence of a static contract or other pre-determined cause of action. Instead, Google *chooses* to maintain the tie and prevent AdWords from submitting the vast majority of bids into non-AdX exchanges.

206.   Google maintains this unlawful tie by continuously signing up new advertisers for AdWords and subjecting them to the same tying arrangement. Each time Google signs a new contract with an AdWords advertiser that prohibits the advertiser from submitting bids to rival

71

exchanges, Google commits a new and affirmative instance of the tying arrangement. Google has signed up thousands of new advertisers to AdWords during the limitations period. TRUSTX suffers new injury each time an advertiser is subjected to this requirement, because the tying arrangement prohibits these advertisers from placing bids on rival exchanges.

207.    Google's tying of RTBs from AdX to the use of Google's publisher ad server DFP is also a continuing violation. After acquiring DFP in 2008, Google required publishers to use DFP to access RTBs from AdX. Still today, Google continues to prevent rival ad servers from putting RTBs from AdX in competition with RTBs from other ad exchanges. Each transaction governed by the DFP-AdX tie—whereby a publisher was forced to transact through DFP to access AdX demand and so did not use TRUSTX to effect the transaction—was a new and independent harm to TRUSTX by Google, which declines again and again to permit AdX to send RTBs to other ad servers. DFP's software unfairly preferences AdX, including through Dynamic Allocation. Each time a new publisher signs up with DFP and is subject to the same tying arrangement, Google commits a new and affirmative act. Each time TRUSTX has lost auctions to AdX that it otherwise would have won but for Google coercing publishers to use DFP to obtain access to AdX, it is harmed. *See In re Google Digital Advert. Antitrust Litig.*, No. 21-MD-3010 (PKC), 2026 WL 91448, at *9 (S.D.N.Y. Jan. 13, 2026) (finding that Rumble "adequately alleged that the DFP-AdX product tie is an act that 'inflicted continuing and accumulating harm'" (citation omitted)).

208.    Beyond Google's specific choices to continue its ties, Google's overarching pattern of conduct is a continuing violation. Among other things, each of the anticompetitive acts—Google's tying of AdX to the use of Google's publisher ad server DFP, tying of AdWords Demand to AdX, Project Bernanke, First Look, Last Look, SSDRS, Project Poirot, Open Bidding, and Unified Pricing Rules—built on each other to exploit Google's monopoly power and compound

72

harm to customers and competitor exchanges. Each act was new and independent, rather than merely a reaffirmation of the previous act, to entrench AdX's dominance and Google's monopoly. These independent acts each inflicted new and accumulating injury on TRUSTX.

209.    The compounding harms from Google's anticompetitive acts could not have been ascertained until the programs were all publicly revealed and the passage of time allowed observation of their effect on markets involving complex auctions. Each act itself has inflicted millions or billions of instances of harm, but the acts work more effectively when piled on top of one another. These independent acts are all instrumental pieces of Google's broader anticompetitive plot. Only now that Google's conduct has been publicly revealed in its totality, and the effects of its conduct observed, is TRUSTX able to bring suit for the resulting damages.

## CLAIM

**Monopolization of the Ad Exchange Market in Violation of Sherman Act § 2.**

210.    TRUSTX incorporates by reference each of the allegations set forth in paragraphs 1-209 above.

211.    As the U.S. District Court for the Eastern District of Virginia has found, "Google has violated Section 2 of the Sherman Act by willfully acquiring and maintaining monopoly power in . . . the open-web display ad exchange market." *Ad Tech Liability Op.* at 810.

212.    There is a global market for ad exchanges for Open Web display advertising. *Id.* at 837. There is also a United States market for ad exchanges for Open Web display advertising.

213.    Google has monopoly power in both the Global and the United States' markets for ad exchanges for open web display advertising. Google unlawfully monopolized both the Global and the U.S. ad exchange markets through the course of exclusionary conduct and anticompetitive acts described in this Complaint. Each of Google's actions increased, maintained, or protected its

73

ad exchange monopoly. Google's anticompetitive conduct includes:

(i) Google's tying of RTBs from AdX to the use of Google's publisher ad server;

(ii) Google's tying of AdWords Demand to AdX;

(iii) Project Bernanke;

(iv) First Look;

(v) Last Look;

(vi) Sell-Side Dynamic Revenue Share;

(vii) Project Poirot;

(viii) Open Bidding, including the additional fee charged to non-Google exchanges under this policy;

(ix) Unified Pricing Rules.

214. Google's conduct serves no legitimate or pro-competitive purpose that could justify its anticompetitive effects.

215. Google's conduct violated Section 2 of the Sherman Act, which prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2.

216. TRUSTX is a competitor in both the Global and United States markets for ad exchanges for open-web display advertising. TRUSTX began operating its own ad exchange competing directly with Google's AdX by 2017. TRUSTX has also developed and implemented header bidding technology for the purpose of competing with Google's programmatic ad sales technology, including AdX.

217. Google's exclusionary conduct materially harmed TRUSTX's ability to compete in

74

the market for ad exchanges for open-web display advertising. TRUSTX was harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. In particular, Google's conduct has:

(i)      impaired TRUSTX's growth by limiting the volume of its business and thus its revenues, resources (including data), and opportunities to levels materially lower than they would have been in a genuinely competitive market;

(ii)     forced TRUSTX to implement technology, such as header bidding, that would not have been necessary absent Google's abuse of its market power, distracting the company and consuming investment resources that could have been allocated to more valuable innovation;

(iii)    required TRUSTX to incur costs, engage in sales and marketing efforts and customer maintenance efforts (including maintenance of technology such as header bidding wrappers) that far exceed what would have been required in a competitive market;

(iv)     forced TRUSTX to expend efforts to develop liquidity for its ad exchange that would have been unnecessary absent Google's restrictions on access to advertisers through its AdWords product;

(v)      created the need for TRUSTX to research factors influencing programmatic auction results, which were frequently fully or partially concealed by anticompetitive policies implemented by Google.

218.    As an injured rival in the ad exchange market, TRUSTX's harms flowed from the same conduct that inflicted harms on consumers. TRUSTX suffered and will continue to suffer substantial damages and irreparable injury, and such damages and injury will not abate until

TRUSTX is awarded damages, and an injunction ending Google's anticompetitive conduct is issued.

## REQUEST FOR RELIEF

219.    For the reasons set out above, TRUSTX respectfully requests that the Court enter judgment in favor of TRUSTX and against Google awarding the following relief:

i.     Issuing an injunction prohibiting Google's anticompetitive conduct and mandating that Google take all necessary steps to cease such conduct and restore competition;

ii.    Awarding a declaration that the restraints complained of in this pleading are unlawful;

iii.   Awarding, as monetary relief pursuant to 15 U.S.C. § 15(a), compensatory, consequential, and punitive damages, including treble damages, for injuries directly and proximately caused to TRUSTX by Google, as proved at trial, as well as the costs of suit, including attorneys' fees;

iv.    Awarding any other equitable relief necessary to remedy Google's anticompetitive conduct and prevent future anticompetitive conduct; and

v.     Granting such other relief as the Court deems appropriate.

## REQUEST FOR A JURY TRIAL

220.    Pursuant to Federal Rule of Civil Procedure 38(b), TRUSTX demands a trial by jury on all of the claims asserted in this Complaint that are triable to a jury.

Date: April 16, 2026                                Respectfully submitted,

                                                     */s/ Matthew C. DeFrancesco*

                                                    Adam M. Acosta *(pro hac vice forthcoming)*
                                                    Pierson Ferdinand LLP
                                                    601 Pennsylvania Ave NW, Suite 900
                                                    Washington, DC 20004
                                                    (771) 244-2815
                                                    adam.acosta@pierferd.com

                                                    Matthew C. DeFrancesco (JD1427)
                                                    Pierson Ferdinand LLP
                                                    1270 Avenue of the Americas
                                                    7th Floor—1050
                                                    New York, NY 10020
                                                    (475) 284-2005
                                                    matthew.defrancesco@pierferd.com

                                                    *Counsel for Plaintiff*